In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-2950

PAMELA J. BURKS,

*Plaintiff-Appellant*,

*v.*

WISCONSIN DEPARTMENT OF
TRANSPORTATION, MARCIA L. TRASKA,
and MARY P. FORLENZA,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 503—**Barbara B. Crabb**, *Chief Judge.*

———————

ARGUED JANUARY 10, 2006—DECIDED SEPTEMBER 29, 2006

———————

Before BAUER, RIPPLE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.*  After her employment was termi-
nated on August 9, 2002, Pamela Burks brought this
action against her former employer, the Wisconsin Depart-
ment of Transportation ("WDOT"), as well as two WDOT
employees, Marcia Traska and Mary Forlenza. In her
complaint, Ms. Burks alleged a number of claims against the
defendants: discrimination and the creation of a
hostile work environment on the basis of disability in
violation of the Vocational Rehabilitation Act of 1974

("Rehabilitation Act"), 29 U.S.C. § 794; unlawful discrimina-
tion based on race, color and ancestry in violation of Title
VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;
retaliation for activities protected by Title VII; retaliation on
the basis of disability in violation of the Rehabilitation Act;
deprivation of property without due process of law in
violation of the Fourteenth Amendment; and harassment
and retaliation on the basis of race also in violation of the
Fourteenth Amendment.

The district court awarded summary judgment in favor of
the defendants on all counts. For the reasons set forth in the
following opinion, we affirm the judgment of the district
court.

# I

## BACKGROUND

### A. Facts

Ms. Burks is of African-American and Hispanic descent.
As a result of a 1984 automobile accident, she suffers from
permanent hearing and sight impairment, and shoulder,
neck and spinal cord injuries. These injuries make it difficult
for her to walk, sit or stand for extended periods of time.

In 2000, Ms. Burks applied for a position in the WDOT
Bureau of Transit and Local Roads, Local Transportation
Programs and Finance Section. She interviewed with Ms.
Traska and Ms. Forlenza in December of 2000, and she
disclosed the nature of her disabilities, as well as some
of her requested accommodations. Ms. Burks ultimately
was hired and appointed to the position of program man-
ager in November 2001; in that position, she was required
to complete a probationary period of six months before
assuming permanent employee status. Ms. Traska was a
Unit Supervisor in the Bureau of Transit and was Ms. Burks'

immediate supervisor during her term of employment.[1] Ms. Forlenza was a Planning and Analysis Administrator at WDOT and was Ms. Traska's immediate supervisor.

According to Ms. Burks, soon after she was hired, she filled out a disability self-identification form. She also informed Ms. Traska and Ms. Forlenza that, because she previously had been employed by the State of Wisconsin, her disability information already should have been on file. Ms. Burks claims that, because of her disability, she needed a number of reasonable accommodations: an amplified telephone, visually contrasting paper, large grip pencils and pens, reduced lighting, a chair with adjustable arm rests and a raised work station so that she may work while sitting or standing. Ms. Burks alleged that in late November or early December 2001, she was invited to the WDOT chair lab to select a chair that would accommodate her disability. Plans for the raised work station were not approved until May 2002, and the work station was not completed prior to Ms. Burks' termination. Ms. Burks believes that the untimeliness of these accommodations is evidence of disability discrimination.

---

[1] In her appellate brief, Ms. Burks argues that Ms. Traska was not a supervisor during the time that Ms. Burks was employed at WDOT, even though Ms. Traska informally acted as her supervisor. *See* Appellant's Br. at 4. However, this assertion contradicts Ms. Burks' complaint, in which she alleges that Ms. Traska was her immediate supervisor. *See* R.2 at 3. In any event, to the extent that it is material, there does not appear to be a genuine issue of fact as to whether Ms. Traska was supervising Ms. Burks during her employment with WDOT. Ms. Traska completed Ms. Burks' three- and six-month evaluations and was responsible for the weekly monitoring of Ms. Burks' performance after Ms. Burks' six-month evaluation.

In her position as program manager, Ms. Burks processed applications from localities for program benefits from WDOT. According to Ms. Burks, a substantial portion of her workload involved the use of a computer application, the Local Roads Improvement Program ("LRIP"). At the time of Ms. Burks' hire, another employee, Ms. Cole, held a position similar to the one Ms. Burks assumed. Ms. Burks and Cole often worked closely together on projects, completing the same type of work and using the same computer program. Ms. Burks also had frequent interaction with Ms. Watzke, a receptionist on the floor, and Ms. Brigham-Abrouq, who managed the LRIP computer application and consulted with the unit on the use of that application.

On February 19, 2002, Ms. Burks received a positive three-month probationary review, completed by Ms. Traska. The review stated that Ms. Burks was "meet[ing] normal performance standards," and that "she can be counted on to follow through on assignments" in a timely manner. R.9, Ex.E at 2.

According to Ms. Burks, she complained to Ms. Forlenza for the first time in March 2002 that she was being harassed because of her race and disabilities. Ms. Burks claims that the harassment included Ms. Traska's coming to her office several times a day, as well as Ms. Traska's spreading of rumors around the office about Ms. Burks' disabilities and her need for accommodation. After March, Ms. Burks alleges that she continued to alert Ms. Forlenza about incidents of discrimination. Ms. Burks also claims that, over the course of her employment, both Ms. Traska and Ms. Forlenza "became increasingly critical, hostile, and down-right rude." R.16 at 8. According to Ms. Burks, Ms. Traska and Ms. Forlenza would "verbally attack" and "berate" her at unit meetings. R.15 at 9-10. She also alleges that the

defendants began to criticize the manner in which she took meeting notes that were shared with the group.

On May 15, 2002, Ms. Burks received her second evaluation from Ms. Traska; it was noted that her performance "d[id] not meet normal performance standards." R.9, Ex.G at 2. Ms. Traska also noted that there had been a decline in the "level and dependability of [Ms. Burks'] work performance and attitude" since the three-month evaluation, and that her performance had "been uneven and unpredictable." *Id.* Also, Ms. Traska wrote that the "inconsistent quality of her work and accompanying attitude are not acceptable" and that Ms. Burks tended to blame others for her mistakes. *Id.* However, Ms. Traska noted that Ms. Burks "recently . . . [had] take[n] more initiative, responsibility, and accountability for her work." *Id.* Accordingly, Ms. Forlenza extended Ms. Burks' probationary period three more months, for a total of nine months, and set up weekly monitoring of Ms. Burks by Ms. Traska.

On August 9, 2002, Ms. Burks was terminated during her extended probationary period. A letter sent to Ms. Burks gave five reasons for her termination: (1) "Failure to meet assigned deadlines;" (2) "Failure to follow-up and effectively communicate with local officials;" (3) "Lack of initiative in performing [her] job duties;" (4) "Not following directions and providing deliverables as requested;" and (5) "Not taking personal responsibility for effectively completing [] work assignments." R.9, Ex.I at 1.

After Ms. Burks was terminated, Cole was asked to remove all paperwork from Ms. Burks' desk and to complete a detailed inventory of everything found there. Watzke assumed Ms. Burks' former duties as a program manager.

Ms. Burks later filed this action. She alleged claims against WDOT for retaliation and for racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. She further alleged discrimination and creation of a hostile work environment based on disability in violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Ms. Burks' action also included claims against Ms. Traska and Ms. Forlenza under 42 U.S.C. § 1983 for racial discrimination and retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment; for discrimination and retaliation based on disability in violation of the Rehabilitation Act, 29 U.S.C. § 794; and for deprivation of property without due process of law in violation of the Fourteenth Amendment. The district court granted summary judgment to the defendants on all these claims.

At issue in this appeal is the defendants' alleged discrimination based on race and disability, as well as their alleged retaliation against Ms. Burks based on her complaints of racial and disability discrimination.

## II

## DISCUSSION

We review the district court's grant of summary judgment de novo, examining the facts in a light most favorable to Ms. Burks as the non-moving party and drawing all reasonable inferences in her favor. *See Haywood v. Lucent Techs.*, 323 F.3d 524, 529 (7th Cir. 2003).

### A.  Discrimination Based on Race

Ms. Burks alleges racial discrimination in violation of Title

VII and the Fourteenth Amendment. Our analysis is the same for both claims.[2] In her response to the defendants' motion for summary judgment, Ms. Burks claims that she has demonstrated racial discrimination under the indirect method,[3] thus establishing a prima facie case of discrimina

---

[2] Although Ms. Burks brought suit against WDOT under Title VII and brought suit against Ms. Traska and Ms. Forlenza under § 1983, the district court correctly noted that the claims should be analyzed in the same way and that the same standard of liability should be imposed. *See* R.40 at 8 (citing *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003)). The only difference between a claim under Title VII and a claim under § 1983 is who can be named as a defendant in the action. *See* R.40 at 9.

[3] There are two ways for a plaintiff to establish discrimination, the "direct method" and the "indirect method." The "indirect method" is the familiar burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The "direct method," on the other hand, requires the plaintiff to put forth evidence that demonstrates that she was a member of a protected class and *"as a result* suffered the adverse employment action of which [s]he complains." *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (emphasis in original). Under the direct method, a plaintiff must come forward either with direct or circumstantial evidence that "points directly to a discriminatory reason for the employer's action." *Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005).

On appeal, Ms. Burks also makes reference to showing a "convincing mosaic of circumstantial evidence," alluding perhaps to the direct method of proof of a discrimination claim. Appellant's Br. at 23; *see also Blise*, 409 F.3d at 866 (stating that a "plaintiff can . . . prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the

(continued...)

tion under the familiar burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). To do so, she must show that: (1) she is a member of a protected class, (2) her job performance met WDOT's legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff. *See id*.

If the plaintiff establishes a prima facie case, a presumption of discrimination is raised, and the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its action. *Id*. ("At this stage, the reason need only be facially nondiscriminatory."). If the employer meets this burden, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *See Scaife v. Cook County*, 446 F.3d 735, 739-40 (7th Cir. 2006).

### 1. Prima Facie Case

In this case, it is not disputed that Ms. Burks is a member of a protected class or that she suffered an adverse employment action when she was terminated. We therefore shall discuss only the two remaining prongs.

---

[3] (...continued)
decisionmaker." (internal quotation marks omitted)). Ms. Burks did not rely on the direct method of proof in the district court, and arguments not made before the district court are waived on appeal. *See Perruquet v. Briley*, 390 F.3d 505, 517 (7th Cir. 2004). Even if we were to examine her claim under the "direct method," she offers no circumstantial evidence that would sustain the view that racial animus was the reason for her termination.

### a. similarly situated individuals treated more favorably

Ms. Burks claims that she was treated differently than three individuals whom she claims were similarly situated: Cole, Ms. Traska and Watzke. In order for an individual to be similarly situated to the plaintiff, the plaintiff must show that the individual is "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Factors relevant to this inquiry include whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience and qualifications. *Id.*; *see also Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Ms. Burks fails in her attempts to show that Ms. Traska and Watzke are similarly situated because neither Ms. Traska nor Watzke held the same position as Ms. Burks, nor did they have similar job responsibilities. During Ms. Burks' employment, Ms. Watzke was a receptionist, not a program manager. As for Ms. Traska, she had some supervisory responsibilities over Ms. Burks, including monitoring her performance weekly during the last three months of Ms. Burks' employment with WDOT. We previously have stated that, ordinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee. *Cf. Patterson*, 281 F.3d at 680.

Although Cole and Ms. Burks had similar job positions and responsibilities, Ms. Burks has not demonstrated that their job performance was similar. We have cautioned that, in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a "comparable set of failings." *Haywood*, 323 F.3d at 530; *see also Jones v. Union Pac. R.R. Co.*,

302 F.3d 735, 745 (7th Cir. 2002) (holding that an employee who claimed he was similarly situated to a coworker made an "unsuitable comparison" because he was not disciplined for the same reasons as the coworker). Ms. Burks asserts that she and Cole took meeting notes in the same manner, yet only she was reprimanded for her note-taking style. However, Ms. Burks does not allege that Cole shared in her other alleged shortcomings, such as failing to meet deadlines or to follow directions.[4] Additionally, Ms. Burks puts forth no evidence that Cole, Ms. Traska or Watzke had performance reviews similar to Ms. Burks. Therefore, none of the three had a "comparable set of failings," *Haywood*, 323 F.3d at 530, and thus none of the three were similarly situated.

### b.   work performance met legitimate expectations

The defendants point to several pieces of evidence demonstrating that Ms. Burks' performance was unsatisfactory. Both Ms. Traska and Ms. Forlenza stated that Ms. Burks had a poor attitude, tended to blame others for her mistakes and failed to take the necessary steps to complete her assignments in a timely and accurate manner.[5]

---

[4]  As we discuss infra at 15-17, Ms. Burks has not come forward with evidence that these noted differences were pretextual.

[5]  When the defendants went through the contents of Ms. Burks' desk after she departed, they found paperwork she claimed never to have received, documents that were months old, and numerous projects that either had not been processed or needed additional work. *See* R.8 at 10. Because the defendants were not aware of the contents of Ms. Burks' desk prior to the termination of her employment, we cannot consider such evidence as indicative of whether the defendants believed that Ms. Burks was

(continued...)

According to the defendants, they also received several complaints from local officials regarding Ms. Burks' failure to return their messages regarding LRIP projects. *See* R.9, Ex.G at 3. Additionally, after Ms. Burks' six-month evaluation, her work was supervised on a weekly basis by Ms. Traska. The defendants have submitted the detailed log of this weekly supervision, outlining situations in which Ms. Burks did not follow proper procedures, failed to complete projects accurately and missed deadlines. *See* R.28, Ex.C.

Despite this evidence, Ms. Burks asserts that she has put forward sufficient evidence to create at least a factual dispute regarding the adequacy of her work performance. For example, Ms. Burks submitted affidavits from Brigham-Abrouq and Cole, who both indicated that, in their opinions, Ms. Burks was performing well in her job and was learning the necessary skills at an acceptable rate. *See* R.17; R.18. However, we have indicated previously that "general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002); *see also Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir. 1994) (same). In fact, our case law consistently states that the affidavits of coworkers do not establish a material issue of fact on the

---

[5] (...continued)
meeting their expectations at that time. However, the inventory of her desk does corroborate their estimation of her work performance.

issue of adequacy of performance.[6] *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004)

---

[6] In *Dey v. Colt Construction and Development Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994), we held that coworker testimony created a triable issue of fact in the similar context of pretext. Although we stated that "general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or coworkers," we also stated that "a plaintiff may create a triable issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies." *Id.* In *Dey*, the plaintiff's coworkers corroborated that *specific* events, cited by the employer as reasons for her termination, had not occurred. This type of corroboration helped create, we held, a triable issue of fact. *Id.* at 1461.

Ms. Burks simply has not offered this type of specific evidence here. Cole's affidavit does not challenge the veracity of facts or events on which WDOT's assessment of Ms. Burks' performance was based. Cole, in her affidavit, states generally that Ms. Burks' work was "extremely satisfactory" and that she "was motivated and seemed to be a hard worker." R.17 at 5. Such statements, however, do not establish that Ms. Burks was meeting her employer's legitimate expectations—only that Cole did not perceive a problem.

Brigham-Abrouq's affidavit is similarly deficient in demonstrating that Ms. Burks was not meeting her employer's legitimate expectations. Brigham-Abrouq states that Ms. Burks made less mistakes in entering data into the computer than Ms. Traska, *see* R.18 at 2; however, mistakes in entering data was not one of the stated reasons for Ms. Burks' termination. Cole and Brigham-Abrouq also both opine that Ms. Traska and Ms. Forlenza were "setting Burks up to fail," R.18 at 6, R.17 at 7; however, these conclusory opinions, unsupported by specific facts, are insufficient to create a genuine issue of triable fact.

(noting "that plaintiff's coworkers 'may have thought that [she] did a good job . . . is close to irrelevant'" (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998))); *Anderson*, 13 F.3d at 1125 ("The mere submission of materials from a coworker or supervisor indicating that an employee's performance is satisfactory . . . because he was not entirely responsible for several admitted mishaps, does not create a material issue of fact."); *Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1223 (7th Cir. 1980) (per curiam) (stating that a plaintiff who offers the opinions from some of his coworkers that "his work was good" does not "impeach the legitimacy of his employer's expectations").

Ms. Burks also points to her positive three-month evaluation as evidence that she was meeting her employer's expectations. Although Ms. Burks may have been performing adequately at the time of her positive evaluation, the critical inquiry is her "performance at *the time of* [her termination]." *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005) (emphasis in original) (holding that prior positive evaluations did not demonstrate that the employee was performing adequately at the time of her adverse employment action). Therefore, although prior evaluations can be relevant in some circumstances, they "cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998).

Finally, Ms. Burks submits that a document that she has described as the "LRIP Process Summary" shows that she was completing her assignments in a timely fashion. *See* Appellant's Br. at 32. Specifically, she points to a document entitled "LRIP Application Process Progress, as of 04/19/02," which states that she had completed 97.8% of

"Entitlement" applications, that Cole had completed 103.16% of "Entitlement" applications and that Ms. Traska had completed 1.52% of the "Discretionary" applications. R.16, Ex.B at 4. Neither party has explained adequately the significance of this document; Ms. Burks' counsel stated at oral argument that it was simply a "subjective" computer printout from the LRIP program. It is still unclear, however, exactly what the percentage is measuring or how the computer program calculated the percentage. Even assuming this document accurately shows that Ms. Burks completed work on 97.8% of her assigned applications, it does not state that Ms. Burks completed these assignments on time. Nor does it show that she followed directions and completed the applications accurately—two performance deficiencies cited by WDOT in her termination letter. Additionally, this table does not refute the three other reasons why WDOT found Ms. Burks performance to be lacking: failure to follow up and effectively communicate with local officials, lack of initiative in performing job duties, and failure to take personal responsibility for effectively completing work assignments. In sum, although the document, and other evidence submitted by Ms. Burks, may show competency and/or efficiency with respect to certain aspects of her position, the evidence proffered does not counter directly the performance deficiencies identified by WDOT. Consequently, Ms. Burks' evidence is not sufficient to create a material issue of fact as to whether Ms. Burks was meeting her employer's legitimate expectations.

### 2. Pretext

Because Ms. Burks failed to establish a prima facie case of race discrimination, it is unnecessary to reach the issue of pretext. *See, e.g., Haywood*, 323 F.3d at 531. Nevertheless, for

the sake of completeness, we shall address briefly this consideration.

The defendants have articulated several nondiscriminatory reasons for terminating Ms. Burks: that she failed to meet assigned deadlines; that she failed to follow up effectively with local officials; that she did not follow directions; that she lacked initiative; and that she did not take personal responsibility for completing her work assignments. Because such nondiscriminatory reasons have been proffered, the burden of proof shifts to Ms. Burks to establish that each of the defendants' reasons is pretextual.[7]

---

[7] Ms. Traska and Ms. Forlenza also submit that they are entitled to an "inference of nondiscrimination" that their proffered reasons were not pretextual because they were the same individuals who hired Ms. Burks. Appellees' Br. at 23. If they had wanted to discriminate against her, the defendants claim, they simply would not have hired her in the first place. *See E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir. 1996) (noting that, in the context of pretext, a medical center director who had hired an individual was given a presumptive inference of nondiscrimination when an adverse employment action was taken against the employee because the director "could have refused to hire [the employee] in the first place" if the director had wished to discriminate against that individual). However, Ms. Burks asserts that she only was hired because she had the most points in a point-based hiring system, and the defendants indicate that hiring was based, at least in part, on a points-based system. *See* R.25 at 3. Arguably, therefore, there appears to be a material issue of fact about whether Ms. Traska and Ms. Forlenza had the discretion not to hire Ms. Burks given her point total and, accordingly, should not be given the benefit of a presumption that their termination of Ms. Burks was not pretextual. Because we believe that the reason given for Ms. Burks' termination was

(continued...)

*Plair*, 105 F.3d at 348. In order to be pretextual, the proffered reasons must be a "lie"; we look to "whether the employer's reasons for its decision are honest and genuinely motivated." *Id.* at 348-49. We are not concerned with whether or not the employer's actions were "mistaken, ill considered or foolish, so long as [the employer] honestly believed those reasons." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

As we discussed earlier, Ms. Burks points to several pieces of evidence to demonstrate that her job performance was adequate.[8] However, our pretext inquiry is not whether Ms. Burks actually was meeting expectations. Rather, our inquiry is whether Ms. Traska and Ms. Forlenza's proffered reason for terminating Ms. Burks— inadequate job performance—was a lie to cover up a true motivation of racial animus. An employee's attempt to avoid summary judgment cannot succeed unless the employee puts forth evidence suggesting that the employer itself did not believe the proffered reasons for termination. *See Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 397 (7th Cir. 1998). Ms. Burks has put forth no such evidence. In fact, the evidence in the record, including Ms. Burks' performance

---

[7] (...continued)
not pretextual, we need not resolve this question.

[8] As noted above, Ms. Burks' proffered evidence included coworker affidavits. Although Ms. Burks' coworkers thought that Ms. Burks' performance was satisfactory, WDOT supervisors were not required to concur in that assessment. *See, e.g., Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1223 (7th Cir. 1980) ("Plaintiff does not raise a material issue of fact on the question of the quality of work merely by challenging the judgment of his supervisors.").

reviews and weekly progress reports completed by Ms. Traska, are consistent with the stated reasons for her termination. Without setting forth specific evidence demonstrating that the defendants' proffered reason was a lie, Ms. Burks cannot show pretext, and thus her case cannot survive summary judgment on this claim.

## B.   Discrimination Based on Disability

In order to prevail on a claim of discrimination under the Rehabilitation Act, a plaintiff must demonstrate that: (1) she is disabled as defined by the Act; (2) she is otherwise qualified for the position sought; (3) she has been excluded from the position solely because of her disability; and (4) the position exists as part of a program or activity receiving federal financial assistance. *See Knapp v. Northwestern Univ.*, 101 F.3d 473, 478 (7th Cir. 1996). The parties do not dispute that the fourth prong is satisfied, as the WDOT receives federal funding.

Ms. Burks submits that she has a qualifying disability because she is hearing and sight impaired and because she has difficulty sitting or standing for extended periods of time and sleeping through the night. Under the Rehabilitation Act, a person is disabled if she has "a physical or mental impairment which substantially limits one or more of such person's major life activities." 29 U.S.C. § 705(20)(B)(i).[9] Under the United States Department of

---

[9] The Rehabilitation Act also protects individuals who are "regarded as having such an impairment." 29 U.S.C. § 705(20)(B)(iii). Even if Ms. Burks was not actually disabled under the meaning of the Rehabilitation Act, she still could be

(continued...)

Transportation regulations,[10] a "physical impairment" includes "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs . . . ." 49 C.F.R. § 27.5(2)(a)(i). The regulations also state that "[m]ajor life activities" include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 27.5(2)(b).

The defendants do not dispute that seeing, hearing, sitting, sleeping and standing are "major life activities." However, they do claim that Ms. Burks' condition did not "substantially impair[]" any major life activities. Appellees' Br. at 26. The regulations do not contain any definition of "substantially impair." Therefore, we must look to case law

---

[9] (...continued)

covered by the Act if the defendants regarded her as having an impairment that substantially limited a life activity. However, Ms. Burks never has argued that the defendants "regarded" her as having such an impairment. *Id.*

[10] The Rehabilitation Act directs each federal agency distributing financial assistance to entities to "promulgate such regulations as may be necessary to carry out" various sections of the Act. 29 U.S.C. § 794(a). In this case, the record does not state from which federal agency the Wisconsin Department of Transportation received federal funding. We shall assume that the funding came from the United States Department of Transportation. Even if we are incorrect, it does not impact our analysis because the regulations defining disability under the Rehabilitation Act are identical for all federal agencies. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1125 n.16 (11th Cir. 1993) (citing regulations).

to determine the meaning of the phrase as found in the Rehabilitation Act.

In *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), the Supreme Court held that, under the Americans with Disabilities Act ("ADA"), "to be substantially limited in performing manual tasks, an individual must have an impairment that *prevents or severely restricts* the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 198 (emphasis added). The *Williams* definition has been applied to major life activities other than manual tasks.[11] Additionally, although *Williams* examines the definition of "substantially limits" in the context of an ADA claim, the *Williams* definition also has been applied to claims under the Rehabilitation Act.[12] *See Scheerer v. Potter*, 443 F.3d 916, 918-19 (7th Cir. 2006). Therefore, we must determine whether Ms. Burks' impairment "prevents or severely restricts" her from engaging in important life activities.

---

[11] *See, e.g., Scheerer v. Potter*, 443 F.3d 916, 918-19 (7th Cir. 2006) (applying the *Williams* standard to the life activity of walking); *Nuzum v. Ozark Auto. Distrib.*, 432 F.3d 839, 845 (8th Cir. 2005) (applying the *Williams* test to "basic motor functions" such as sitting, standing and walking); *Fenney v. Dakota, Minnesota & Eastern R.R. Co.*, 327 F.3d 707, 715 (8th Cir. 2003) (applying the *Williams* standard "no matter the specific class of major life activity one is claiming").

[12] We also have noted that the prima facie case for discrimination is the same under the ADA and the Rehabilitation Act. *See Jackson v. City of Chicago*, 414 F.3d 806, 810 n.2 (7th Cir. 2005) (noting that the only difference between the two claims is that federal funding must be shown in a Rehabilitation Act case). Therefore, we can look to ADA case law to determine whether a Rehabilitation Act plaintiff has established her prima facie burden. *Scheerer*, 443 F.3d at 919.

First, we turn to Ms. Burks' contention that she cannot sit or stand for long periods of time. Ms. Burks does not offer a detailed explanation of her impairment, other than to state that she "cannot sit for more than one to three hours at a time." *See* R.2 at 4. Ms. Burks has not explained her symptoms, nor has she tendered any medical records in support of her claim. On summary judgment, the burden is on the plaintiff to come forward with evidence that she is disabled for purposes of the Act. *See Stein v. Ashcroft*, 284 F.3d 721, 727 (7th Cir. 2002). Indeed, we have stated that "[b]ald and self-serving assertions in affidavits, unsubstantiated by any documentation or other testimony, are not sufficient to create a material issue of fact as to whether an impairment has substantially limited a major life activity." *Id.* at 726. Based on the limited amount of evidence in the record, we cannot conclude that Ms. Burks' impairment "prevents or severely restricts" her ability to sit or stand. *Williams*, 534 U.S. at 198. According to a copy of the ergonomic workstation assessment in the record, Ms. Burks' health care provider informed WDOT that Ms. Burks can work an eight-hour day and that she should not sit for more than three hours at a time. *See* R.10, Ex.D at 7. We see no basis for concluding from this evidence that Ms. Burks' condition "prevent[s] or severely restrict[s]" her from sitting or standing.[13] Ms. Burks has not submitted sufficient evidence to create a material issue of fact on the issue of "substantial limitation." Such vague claims of difficulty standing or sitting for "extended periods of time" were

---

[13] *Cf. Scheerer*, 443 F.3d at 920 (stating that a plaintiff who had diabetic foot ulcers that caused him to "rel[y] on a cumbersome protective boot" and who experienced "intermittent episodes of significant neuropathy" still generally was able to walk and stand, and thus was not substantially limited).

found not to create a material issue of fact by the Eleventh Circuit because the impairments were "couched in vague terms and unaccompanied by any evidence that the described afflictions were any worse than is suffered by many adults." *Rossbach v. City of Miami*, 371 F.3d 1354, 1358-59 (11th Cir. 2004) (also stating that someone who walks, sits, stands or sleeps moderately below average is not disabled); *see also Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 644 (2d Cir. 1998) (holding that a plaintiff who stated that he had trouble sitting "for too long" was not substantially limited in his ability to sit).

Similarly, Ms. Burks has not demonstrated that she is substantially limited in the major life activity of sleeping. She stated that she has difficulty sleeping for more than three hours at a time, but provided no medical records or other evidence to demonstrate the effect of this situation on her ability to function in daily life. We have held that only "prolonged, severe and long-term sleep difficulties [] can amount to a substantial limitation in the major life activity of sleeping." *Scheerer*, 443 F.3d at 920 (holding that "intermittent disrupted sleep" is not a substantial limitation); *see also Rossbach*, 371 F.3d at 1359 (holding that plaintiffs who claimed they could not sleep normally and could not get "a solid night's sleep" were not substantially limited from sleeping); *Colwell*, 158 F.3d at 644 (holding that a plaintiff, who stated that he "usually get[s] a tough night's sleep," was not substantially limited in the activity of sleeping, because "[d]ifficulty sleeping is extremely widespread" and because the plaintiff had made no showing that his difficulties were any worse than difficulties suffered by a large number of adults).

Ms. Burks also claims that her sight and hearing are impaired. She offers no further description of her condition, other than to state that she is "unable to see in bright light"

and that she has "hearing loss" that requires an amplified telephone. R.16 at 2. We have emphasized consistently that the determination of whether an individual is substantially limited by her impairments "must be individualized." *Branham v. Snow*, 392 F.3d 896, 903 (7th Cir. 2004). Accordingly, we must examine the *particular* effect of an impairment on an *individual*. A sight impairment, for example, does not necessarily substantially limit a major life activity of an individual. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 488-89 (1999) (noting that severe myopia did not substantially limit the plaintiffs in any major life activity). Ms. Burks has put forth no evidence, other than her need for an amplified telephone or reduced lighting, to substantiate her claim that her sight and hearing impairments prevent or severely restrict her ability to see or hear. Merely alleging a sight impairment is not enough; in *Dyke v. O'Neal Steel*, 327 F.3d 628, 632 (7th Cir. 2003), we held that an individual who only had one eye was not substantially limited because the only limitation on his ability to see was that he could not drive at night nor hold his head straight when looking left to right. Because Ms. Burks has submitted very scant evidence as to how her impairments affect her major life activities of sight and hearing, we cannot conclude that there remains a material issue of fact as to whether she is substantially limited by her impairments.

No material issue of fact remains as to whether Ms. Burks is "disabled" under the Rehabilitation Act, and, therefore, we need go no further in our analysis. The district court properly granted summary judgment to the defendants on Ms. Burks' claim of a violation of the Rehabilitation Act.[14]

---

[14] Because we hold that Ms. Burks' disability is a threshold issue,

(continued...)

## C. Retaliation

Ms. Burks claims that the defendants retaliated against her after she complained of race and disability discrimination in violation of both Title VII, 42 U.S.C. § 2000e-2(a), and the Rehabilitation Act, 29 U.S.C. § 794.[15] She submits that she did not receive negative performance reviews until after she began complaining about discrimination and that she ultimately was fired because she spoke out about her discriminatory treatment.

A plaintiff can show retaliation either through direct or indirect evidence.[16] Under the direct approach, a plaintiff must present evidence of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between

---

[14] (...continued)

we need not address whether she is otherwise qualified for the position sought. Nor need we inquire as to whether she was excluded from the position solely because of a disability.

[15] In her appellate brief, Ms. Burks also states that she was retaliated against in violation of her right to free speech as protected by the First Amendment, made applicable to the states by the Fourteenth Amendment. She made no such argument in her complaint. Instead, she only alleged that she was retaliated against in violation of the Rehabilitation Act and Title VII. She did raise such an argument in her response to defendants' motion for summary judgment, and the defendants correctly argued that the claim could be disregarded because Ms. Burks did not plead such a claim, nor did she amend her complaint to include it. Therefore, we shall not address the First Amendment claim.

[16] We have noted that the provision of Title VII concerning retaliation is "materially identical" to the retaliation provision of the Rehabilitation Act. *See Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003). Therefore, the framework for our analysis is the same under either statute.

the two. *See Haywood*, 323 F.3d at 531, *as modified by Burlington Northern Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2413 (2006). Ms. Burks appears to have established the first two prongs: A complaint about race and disability discrimination to supervisors is protected activity, *see, e.g., Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005), and termination is certainly an adverse action, *see Haywood*, 323 F.3d at 531-32.

Ms. Burks has not put forth any direct evidence of a causal link between her complaints of discrimination, her negative job reviews and her ultimate termination. Instead, she relies on the timing of her complaints as circumstantial evidence of retaliation. *See* Appellant's Br. at 41. She contends that she first complained of race and disability discrimination in March 2002, after her first positive three-month review. After that complaint, Ms. Burks points out, she received her six-month review which was, in contrast to the three-month review, negative. She continued to complain and receive negative feedback until she ultimately was terminated. Ms. Burks therefore contends that, because her complaints, her negative reviews and termination occurred after her favorable review, a permissible inference is that her complaints of discrimination were the cause of the negative reviews and termination.[17] However, we have stated that

---

[17] Ms. Burks relies on *Lang v. Illinois Department of Children and Family Services*, 361 F.3d 416 (7th Cir. 2004), to support her contention that timing alone can demonstrate a causal link. However, in *Lang*, the employee had worked for the employer for five years and, in that time, the employee's performance never was criticized. *Id.* at 420. Criticisms of the plaintiff's job performance, along with disciplinary action against the plaintiff, did not begin until the same month in which he complained about racial discrimination, which we noted was "extremely suspi-
(continued...)

"[s]peculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation." *Sauzek v. Exxon Coal USA, Inc*., 202 F.3d 913, 918 (7th Cir. 2000). Indeed, "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second"; the plaintiff also must put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination and termination. *Id.; see also Oest v. Illinois Dep't of Corr.,* 240 F.3d 605, 616 (7th Cir. 2001). Ms. Burks presents no evidence of a retaliatory motive other than the timing of her termination. Therefore, she has not met her burden under the direct method of proof.

Ms. Burks' retaliation claim also fails under the indirect approach. Under such an approach, Ms. Burks first must establish a prima facie case of retaliation by offering evidence of the following: (1) that she engaged in protected activity; (2) that she was subject to an adverse employment action; (3) that she was performing her job satisfactorily; and (4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). As we have discussed above, Ms. Burks has not established that she was perform-

---

[17] (...continued)

cious" timing. *Id.* In the present case, Ms. Burks only had been working at WDOT for less than a year and was in a probationary period during her entire employment. She does not have the years of positive reviews that made the discipline in *Lang* so suspicious.

ing her job satisfactorily.[18] Moreover, she points to no similarly situated individuals who did not engage in protected speech activity. Therefore, defendants properly were awarded summary judgment.

### D. Deprivation of Right to Jury Trial and Right to Due Process

On appeal, Ms. Burks submits that, in granting summary judgment to the defendants, the district court failed to view all of the evidence in the light most favorable to her. In doing so, it violated her right to due process and to the determination of facts by a jury under the Seventh Amendment. On appeal, we have examined the record in the light most favorable to Ms. Burks, and, therefore, the premise of her argument cannot stand.

To the degree that she is arguing that, as a principle of law, summary judgment cannot be squared with the Constitution, we previously have rejected arguments that summary judgment violates either the Fifth or Seventh Amendments. *See Koski v. Standex Int'l Corp.*, 307 F.3d 672, 676 (7th Cir. 2002). As for the Fifth Amendment, we stated that "[t]he Supreme Court has made it abundantly clear that summary judgment has a proper role to play in civil cases," and thus granting summary judgment does not violate a plaintiff's right to due process. *Id.* We also have stated that summary judgment and Federal Rule of Civil Procedure 56 do not violate the Seventh Amendment, as "this argument . . . flies in the face of firmly established law." *Id.* (citing *Fid. & Deposit Co. of Maryland v. United*

---

[18] *See supra* at 11-13 (discussing Ms. Burks' failure to meet her employer's legitimate expectations).

*States*, 187 U.S. 315, 320 (1902)). The Seventh Amendment does not entitle parties to a jury trial when there are no factual issues for a jury to resolve. *See id*.

Accordingly, the disposition of Ms. Burks' case on a motion for summary judgment did not deprive her of her Fifth or Seventh Amendment rights.

### Conclusion

For the reasons set forth in this opinion, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*