In the

# United States Court of Appeals
## for the Seventh Circuit

No. 22-3212

JENNIFER SHIRK,

*Plaintiff-Appellant,*

*v.*

TRUSTEES OF INDIANA UNIVERSITY, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:21-cv-02395 — **James R. Sweeney II**, *Chief Judge.*

ARGUED SEPTEMBER 27, 2023 — DECIDED FEBRUARY 12, 2026

Before FLAUM, SYKES, and LEE, *Circuit Judges.*[*]

SYKES, *Circuit Judge.* Jennifer Shirk worked for Indiana University in its eLearning Design and Services Group, a unit that assists the university's educational departments and program offices with online instructional resources. Shirk was hired as an intern and moved up the ranks to become an

---

[*] Circuit Judge Joel M. Flaum died while this case was pending, so the appeal is resolved by a quorum of the panel under 28 U.S.C. § 46(d).

online instructional designer. After two and a half years of service, she was fired for unprofessional conduct. Specifically, she sent a series of emails to high-level university officials needlessly alerting them to a temporary problem in her unit—one that a supervisor had already resolved—and accusing her supervisors of mismanagement. Escalating an internal matter to the upper echelons of university leadership was considered insubordinate and a breach of professional protocol.

Shirk contends that she was fired for taking medical leave and requesting accommodations for her mental-health conditions, including obsessive-compulsive disorder and post-traumatic stress disorder. She sued university officials, raising discrimination and retaliation claims under the Rehabilitation Act and the Family and Medical Leave Act ("FMLA"). The district judge entered summary judgment for the defendants on all claims.

On appeal Shirk presses only her retaliation claims. She argues that the judge applied the wrong causation standard and that her evidence is sufficient to proceed to trial when evaluated under the correct law. Our standard of review is de novo, so we have given the case a fresh look without regard to any legal misstep in the decision below. The result is the same. Under the correct causation standard, the summary-judgment record does not support Shirk's claim that she was fired in retaliation for asserting her statutory rights.

## I. Background

In September 2018 Jennifer Shirk began working as an intern in the eLearning Design and Services Group at Indiana University. Housed within the IT Department, the eLearning Group supports internal university "clients"—educational

departments and programs across all university campuses—in the development of web-based instructional resources for online learning. Though the eLearning Group serves the entire IU network, the largest share of its work—and thus most of its funding—comes from the Office of Online Education.

A month after hiring Shirk, Anna Lynch, an eLearning Group manager, promoted her from her temporary intern position to a full-time job as an associate instructional designer. Within four months Shirk advanced again. In February 2019 Lynch moved Shirk up a step to a position as an online instructional designer, a job that came with increased duties and expectations. In her new role, Shirk was required to assume more responsibility for design projects and complete her work with less supervision and support.

After just seven months in her new assignment, Shirk and Erin Tock, a coworker, submitted a joint request asking that their positions be reclassified to higher ranks on the university's pay scale. At the time Tock was an associate instructional designer, one level below Shirk on the pay scale. In September 2019 the two women approached Peter Ermey, their mutual supervisor, and asked that their respective positions be bumped up a step on the pay scale.

The next month, while her reclassification request was still pending, Shirk sought the first of several extended periods of FMLA leave. In October she requested leave from October 29 to January 1, 2020, for treatment of her obsessive-compulsive disorder and post-traumatic stress disorder. Her leave request was approved.

During Shirk's absence, Tock took on much of her work and performed it successfully. Because Tock was effectively

functioning as a designer at Shirk's level, Ermey eventually recommended that the human-resources department grant her reclassification request. Shirk's request was not similarly justified, however. Ermey and Lynch determined that additional evaluation was needed because Shirk lacked evidence that her duties exceeded those of a typical designer at her level.

Shirk returned to work in mid-January, though with restrictions. The COVID-19 pandemic arrived in March 2020, about a month after Shirk was cleared to work without restrictions. The public-health emergency created unprecedented operational challenges and enormous financial uncertainty for the university. IU imposed a hiring freeze, and Shirk's reclassification request was put on hold.

In June 2020 Shirk complained about her stalled reclassification request to James Peltz, an official in the human-resources department who was assigned to her unit. She asserted that her pay was not commensurate with her duties and that gender-based pay inequity was to blame. Peltz investigated and determined that Shirk's compensation was in line with her duties and not discriminatory.

In September Shirk requested and received another extended period of FMLA leave from September 14 to October 16, 2020. This leave request was unexpected. Shirk's sudden absence created operational hardships for the eLearning Group because her ongoing projects had to be reassigned and her lack of notice left her unit managers scrambling to cover her work. Indeed, Lynch learned of Shirk's FMLA leave not from Shirk herself but from a client who emailed Lynch asking about plans for covering Shirk's work during her absence. That led Lynch and Justin Zemlyak,

the newly appointed director of the eLearning Group, to complain to human resources that Shirk had failed to inform them of her impending leave.

On September 28, while on FMLA leave, Shirk filed another complaint with human resources reiterating her allegations about her stalled reclassification request and adding a claim of disability discrimination. She also alleged that Lynch was bullying her and asked that she not be required to report to her. This latest complaint was assigned to David Duncan, another human-resources professional.

When Shirk returned from FMLA leave in mid-October, Duncan notified her that he had investigated her allegations and determined that no one in the eLearning Group had violated university policy. He advised her that if she wanted a more fulsome review of her discrimination allegations, she could file a formal complaint with the university's Office of Institutional Equity.

During her tenure in the eLearning Group, Shirk also sought and was granted accommodations for her disabilities. In the fall of 2019, she asked for a refrigerator and microwave at her workspace; that request was granted. In December 2020 she submitted a long list of additional requested accommodations, including: (1) the continued ability to work remotely; (2) a flexible work schedule and hours; (3) at least one business day advance notice for meetings with her leadership team, together with a written agenda for the meeting; (4) a support person at meetings with her leadership (she proposed Christy Cavanaugh, a supervisor who served above Ermey but below Lynch in the unit organization chart); (5) the use of a shared, virtual document system (like Google Documents) to communicate with colleagues and supervisors

on project assignments, with clear and consistent communications and express statements of expectations for each person's role in the project; and (6) "transparency" regarding her job performance and feedback.

The sheer breadth of this request came as a surprise to her unit managers and required several weeks to evaluate and resolve through the university's interactive process. To Lynch in particular, Shirk's request seemed less an accommodation than a request for a demotion in rank. Several of Shirk's proposed accommodations required a level of supervision and flexibility associated with her previous position as an associate instructional designer, which she willingly gave up when she was promoted to the more independent position of online instructional designer. Zemlyak, the eLearning Group's director, called Shirk's proposed accommodations "ridiculous" because implementing them would disrupt the eLearning Group's well-established practices.[1]

While the interactive process on her request for accommodations was still underway, Shirk sought and received a few more days of FMLA leave.[2] When she returned in January

---

[1] Zemlyak later clarified this statement, explaining that he had assumed that Shirk's accommodations would extend to everyone in the eLearning Group. If limited to Shirk, he agreed that they imposed a minimal burden.

[2] Around this time, Jim Peltz, the human-resources official who handled Shirk's initial complaint about her stalled reclassification request, reentered the picture. The timing and details are vague, but he testified in deposition about a disagreement he had with Carol Barnett, who was then Senior Associate General Counsel in IU's General Counsel's Office. The conflict between the two predates and appears to be largely unrelated to the events in this case, but at some point they clashed over a possible plan to assign Shirk to a new supervisor (presumably to address her concerns

2021, she filed a formal complaint with the Office of Institutional Equity. Just days later, she filed a discrimination charge with the EEOC. Shirk alleged in both complaints that she had encountered recurrent and escalating hostility because of her disabilities and corresponding FMLA leave.

At the conclusion of the interactive process, the university approved all of Shirk's requested accommodations except for a support person at meetings with her leadership team. Shirk was notified of this favorable decision by letter on February 22, 2021. She contested the denial of a support person, but IU stuck to its position, explaining that providing a support person was both unnecessary and burdensome. As an alternative Shirk proposed that she be permitted to record all meetings with her unit leadership. That request was denied based on confidentiality concerns.

In early April the Office of Institutional Equity notified Shirk that it had investigated her allegations of disability discrimination and retaliation and found them to be unsubstantiated. Two weeks later, the events that led to the loss of her job unfolded.

---

about continuing to report to Lynch). Peltz testified that he prepared an email informing Shirk of the assignment of a new supervisor, but Barnett reversed course and told him to "change [his] story." He declined to do so and then resigned from IU. He also testified that Barnett had at some point suggested searching Shirk's email for information about the quality and quantity of her work, but nothing came of the suggestion. He testified that he left IU because certain unspecified circumstances revealed a "misalignment" of values. He did not elaborate, though he did say that his limited involvement in the Shirk matter was "the last straw." Peltz's conflict with Barnett is too tangential and undeveloped to be relevant here. Barnett was not involved in the decision to fire Shirk.

At the time Shirk had been working with colleagues on a project for the university's online orientation program for new students. On April 15 she met with Zemlyak, Ermey, and others in her unit who were involved in the project. At the meeting Zemlyak reported that the eLearning Group lacked sufficient funding to cover the necessary licensing for the project but said he would consult with Chris Foley, the head of the Office of Online Education, to devise a solution.

Minutes later Shirk emailed Foley herself, asking him to review the "urgent" funding dilemma, laying the blame at Zemlyak's feet, and questioning his competence to resolve the problem. Meanwhile, Zemlyak reevaluated the eLearning Group's budget and, within 30 minutes, decided to strategically reallocate funds to cover the necessary licensing costs.

Zemlyak immediately communicated this decision to Ermey, who passed the news on to Shirk. She agreed that Zemlyak's response was "appropriate" but then sent a series of follow-up emails to Foley explaining that Zemlyak had suddenly changed his mind and expressing concern that the funding solution lacked adequate documentation.

That was not the end of the matter. The next day, April 16, Shirk emailed both Foley and Julie Johnston, the Associate Vice President of Learning Technologies and, more importantly, Zemlyak's boss. Her email detailed the previous day's events and explained how, in her view, Zemlyak and Ermey had "mismanage[d]" the situation. Shirk accused Zemlyak of conniving with Ermey, interrupting her during the funding meeting, and wasting the eLearning Group's resources. And because Zemlyak had not yet provided written

confirmation of his funding decision, Shirk emphasized that she lacked clarity about how to proceed.

Johnston did not engage with Shirk. Instead, she sent a rapid and terse response: "The situation has been resolved." Soon after, Ermey learned about Shirk's emails to Foley and Johnston and asked her to send him the entire email thread. Zemlyak, for his part, called Shirk's actions "completely out of bounds."

Shirk emailed Foley and Johnston again that afternoon. Justifying her earlier messages to them, she complained that the eLearning Group's management had consistently tried to silence her and that Ermey's demand for her emails was more of the same. Shirk also asserted at the end of this email that she was a victim of discrimination and retaliation, which the university had not yet adequately addressed. As a result, she said, her "work environment remains hostile." She closed by asking if she needed to forward her email to Ermey.

On April 19, Kristopher Ying, a human-resources official, notified Shirk that he had scheduled a due-process meeting to discuss her emails. As the notice explained, Shirk had "shared information not relevant to business needs with a key client"—namely, Chris Foley, the head of the Office of Online Education—and had inappropriately bypassed her unit leadership in escalating the funding dilemma to both Foley and Johnston. In the meeting that followed, Ying reviewed each email with Shirk and asked why she had sent them.

Immediately after the meeting, Shirk sought and was granted a fourth period of FMLA leave. That same afternoon, Zemlyak decided to fire her because of her emails to Foley and Johnston. On April 23 Ying sent Shirk a letter by email

informing her that her "employment with Indiana University is terminated as of today" based on "serious misconduct." Specifically, Ying's letter cited Shirk's April 15 and 16 emails to university leadership—including "a key partner in the Office of Online Education"—inappropriately discussing "private matters" regarding her unit and "sharing disparaging personal opinions" about her supervisors, which "threaten[ed] client relationships."

Shirk responded with this lawsuit against the trustees of Indiana University and her supervisors Ermey, Lynch, and Zemlyak. She raised a host of claims, including disability discrimination, failure to accommodate, and retaliation in violation of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, and discrimination and retaliation in violation of the FMLA, 29 U.S.C. §§ 2601 *et seq.* Following extensive discovery, the defendants moved for summary judgment. The district judge granted the motion in its entirety, concluding that Shirk's evidence was insufficient for a reasonable jury to find in her favor on any of her claims.

## II. Discussion

Shirk has narrowed her case on appeal, focusing only on her retaliation claims under the Rehabilitation Act and the FMLA against IU's trustees and Zemlyak.[3] She argues first that the district judge applied an overly strict causation standard to her Rehabilitation Act retaliation claim and, second, that she presented sufficient evidence to proceed to trial on her retaliation claims under both statutes. We review the judge's summary-judgment order de novo, construing the

---

[3] Shirk has abandoned her discrimination and failure-to-accommodate claims and no longer proceeds against Ermey and Lynch.

evidentiary record in the light most favorable to Shirk. *Trahanas v. Nw. Univ.*, 64 F.4th 842, 852 (7th Cir. 2023).

## A. Causation Standards Under the Rehabilitation Act

To prevail on her claim that the university retaliated against her in violation of the Rehabilitation Act, Shirk must prove that (1) she engaged in statutorily protected activity; (2) the university took a materially adverse action against her; and (3) a causal connection exists between the two. *Anderson v. Donahoe*, 699 F.3d 989, 995 (7th Cir. 2012). The judge correctly recited these familiar elements. Shirk contends, however, that when it came to evaluating the sufficiency of her evidence on her retaliation claim, the judge mistakenly applied the "sole" causation standard for claims of *discrimination* under the Act rather than the more lenient standard for a *retaliation* claim.

By its plain terms, the Rehabilitation Act imposes a heightened "sole" causation requirement for a claim of disability discrimination: the Act prohibits recipients of federal funds from discriminating against disabled participants "solely by reason of" their disability. 29 U.S.C. § 794(a). What this means, as relevant here, is that "if an employer fires an employee for *any* reason other than that she is disabled," the claim necessarily fails. *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013) (emphasis added).

But the same heightened causation standard does not apply to a *retaliation* claim under the Act. In § 794(d), the Rehabilitation Act otherwise incorporates the liability standards of Title I of the Americans with Disabilities Act. The ADA's causation standard requires "only that the plaintiff's disability be *a* reason for the challenged action." *Conners v.*

*Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021). And because this standard mirrors the causation requirement in other antidiscrimination statutes, we've explained that retaliation claims under the Rehabilitation Act are subject to the same causation analysis as claims under Title I of the ADA, *Swain v. Wormuth*, 41 F.4th 892, 899 (7th Cir. 2022), and Title VII of the Civil Rights Act, *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 n.16 (7th Cir. 2006).

As such, Shirk must produce evidence that her "protected activity was a 'but for' cause" of the decision to fire her—or, in other words, that the University's action "would not have happened" without it. *Kedas v. Ill. Dep't of Transp.*, 149 F.4th 951, 958 (7th Cir. 2025). Importantly however, "[a] single event can have multiple but-for causes." *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014).

Here the judge cited the correct legal standards for claims under the Rehabilitation Act as an initial matter, but later in his analysis applied the "sole" causation standard to *both* the discrimination *and* retaliation claims under the Act. That was a mistake, as the defendants essentially concede. The judge instead should have analyzed the retaliation claim under the but-for causation standard. Still, "we review judgments, not opinions." *Rhodes v. Dittmann*, 783 F.3d 669, 675 (7th Cir. 2015). Because our standard of review is de novo, we may disregard the judge's legal error and review the summary-judgment record under the correct causation standard. *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).

## B.  Causation Evidence

Although Shirk's two retaliation claims have different statutory sources, they share the same basic framework. Like

its counterparts in the Rehabilitation Act and the ADA, a retaliation claim under the FMLA has "three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).

The first two elements are undisputed here. This case, like many others of this type, turns on proof of causation. Shirk's theory is that Lynch and Zemlyak were angry that she took a second period of extended FMLA leave in the fall of 2020 and their frustration increased when she submitted her request for accommodations. And because they were becoming increasingly "fed up" with her protected activity, they were looking for a reason to fire her and used her emails to university leadership about the funding dilemma as a pretext to do so.

This theory rests almost entirely on remarks Lynch and Zemlyak made when they learned of her September 2020 FMLA leave and her list of requested accommodations. But these isolated comments do not support an inference of a causal link between her protected activity and the decision to fire her. The record is clear that Lynch and Zemlyak expressed frustration over the *lack of notice* of Shirk's September 2020 medical leave—not the leave itself. That's a distinction with a difference. *See Simpson v. Off. of Chief Judge*, 559 F.3d 706, 714 (7th Cir. 2009). And Shirk's reliance on Lynch's negative reaction to her request for accommodations is similarly misplaced. Lynch commented that Shirk's list seemed more like a request for a "demotion" in rank rather than an accommodation because the flexible schedule and degree of support she sought was the primary differentiator between her former

position and her current one. To acknowledge this concern (as Lynch did) is hardly to suggest that Shirk deserved to be demoted or fired. Finally, Zemlyak's characterization of Shirk's list of requested accommodations as "ridiculous" was a stray remark, not enough to call into question his stated reason for firing her several months later—namely, her denigrating and unprofessional emails to top university leadership.

Even if these isolated statements could be interpreted as Shirk suggests, she lacks evidence connecting them to the decision to fire her in April 2021. As an initial matter, Lynch had no part in the decision. Rather, Zemlyak made the decision in collaboration with Kris Ying, and nothing suggests that either of them had Shirk's protected activity in mind. Further, Shirk's requests were favorably received and for the most part granted: IU approved every request for FMLA leave and all but one of her requested accommodations. Moreover, her discrimination complaints were thoroughly investigated and found to be unsubstantiated. That she disagreed with the investigators' conclusions makes no difference in the analysis. Given the entire evidentiary record, no reasonable jury could infer that her protected activity caused her termination.

Shirk resists this conclusion, suggesting that her emails to Foley and Johnston were hardly a serious breach of professional protocol—not serious enough, in any event, to justify the loss of her job. She highlights two factors that, in her view, would permit a reasonable inference that the email episode was a trumped-up pretext for retaliatory termination.

First, she notes that Christy Cavanaugh helped her draft the email alerting Foley to the impending funding crisis. The record is vague on this point, but we will set that problem aside for the sake of argument. Presenting evidence that a

similarly situated employee was treated more favorably is a common method of proving that an employer's reason for an adverse employment action was pretextual—in other words, a lie. *Beverly v. Abbott Labs.*, 107 F.4th 737, 747 (7th Cir. 2024); *see Coleman v. Donahoe*, 667 F.3d 835, 858–60 (7th Cir. 2012). But Cavanaugh and Shirk are not similarly situated. Cavanaugh occupied a managerial role two levels above Shirk.

Where, as here, "the plaintiff is subordinate" to an alleged comparator, the two are not similarly situated. *Burks*, 464 F.3d at 751. Moreover, it's one thing to help draft an email (if indeed Cavanaugh helped with Shirk's email). It's quite another to attach your name and hit send. These differing circumstances distinguish Cavanaugh from Shirk, defeating any inference of pretext. *Coleman*, 667 F.3d at 847.

Second, Shirk points to the last of her emails to Foley and Johnston in which she mentioned her discrimination and retaliation complaints and asserted that her "work environment remains hostile." Embedding a discrimination complaint within otherwise-sanctionable misconduct is not enough to create a triable issue of causation. That describes Shirk's approach here, and the district judge was right to reject it. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002) ("An employee's complaint … does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior."). Shirk's passing reference to her prior discrimination complaints in the last of her insubordinate emails neither inoculates the conduct from discipline nor supports a reasonable inference that the discipline ultimately imposed was retaliatory. *Id.*

In the end, Shirk "completely ignores the elephant in the room": the highly inappropriate nature of her emails to Foley and Johnston. *Davis v. Time Warner Cable*, 651 F.3d 664, 675 (7th Cir. 2011). The defendants have never cited any other basis for the decision to fire her. Indeed, when Zemlyak learned about Shirk's first email to Foley, he described it as "completely out of bounds." Understandably so. Shirk's emails accused her supervisors of mismanaging projects, wasting resources, blanketing decisions in secrecy, and miscommunicating expectations. And she inappropriately raised these grievances to two top university leaders who were many levels above her in the university's organizational structure—including the head of the division that supplied most of the eLearning Group's funding.

The mere fact that Shirk raised the specter of discrimination and retaliation at the end of this sanctionable course of conduct is not enough to infer that IU's reason for firing her was pretextual. The judge properly entered summary judgment for the defendants on Shirk's retaliation claims.

AFFIRMED