In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2622

SURGERY CENTER AT 900 NORTH MICHIGAN AVENUE, LLC,

*Plaintiff-Appellant,*

*v.*

AMERICAN PHYSICIANS ASSURANCE CORPORATION, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 15-cv-4336 — **Sharon Johnson Coleman**, *Judge.*

ARGUED APRIL 12, 2019 — DECIDED APRIL 25, 2019

Before FLAUM, EASTERBROOK, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* A jury found Surgery Center at 900 North Michigan Avenue, LLC ("Surgery Center") liable in a medical malpractice action for $5.17 million. Surgery Center's insurance coverage under its policy with insurer American Physicians Assurance Corporation, Inc. capped out at $1 million per claim, leaving it responsible for the excess judgment. Surgery Center sued for bad faith because its insurer failed to settle the claim for the policy limit. The district court denied

summary judgment to the insurer but, after six days of a jury trial, granted the insurer judgment as a matter of law. We affirm.

## I. Background

### A. Factual Background

Plaintiff-appellant Surgery Center is an outpatient surgical center that permits outside physicians to perform day surgery at its facility. Defendants-appellees American Physicians Assurance Corporation, Inc. and American Physicians Capital, Inc. (collectively "APA") together constitute a medical malpractice insurance company that insured Surgery Center. The insurance policy Surgery Center purchased from APA limited APA's liability to $1 million per claim and provided that APA would defend and indemnify Surgery Center for claims that fell within the policy's coverage.

The current dispute stems from a medical malpractice action against Surgery Center. On November 26, 2002, Dr. Harrith Hasson performed outpatient laparoscopic surgery on Gwendolyn Tate at Surgery Center. Dr. Hasson is an outside physician who had privileges at Surgery Center; he was not a Surgery Center employee. Dr. Hasson did not see Tate or sign her discharge instructions before the center released her. Instead, Surgery Center's anesthesiologist discharged Tate and gave the written discharge instructions to Tate's boyfriend. Four days after surgery, Tate checked into to the hospital with surgical complications (a perforated bowel) that eventually rendered the previously healthy thirty-four-year-old a quadriplegic.

Tate sued Dr. Hasson and Surgery Center in Cook County, Illinois state court in May 2003 for medical malpractice. APA

hired an outside law firm, Lowis & Gellen, to defend Surgery Center in accordance with APA's defense guidelines. Jennifer Lowis and, later, Mark Smith of Lowis & Gellen represented Surgery Center. Guita Griffiths was Surgery Center's president, an attorney, and the point of contact for APA and defense counsel on the Tate case.

As of November 2004, APA set the amount of the "Reserve"—money the Michigan Department of Insurance required APA (a Michigan corporation) to put aside to cover an adverse verdict—at $560,000. APA labeled the case "high exposure" because it believed the damages in the event of an adverse verdict could exceed Surgery Center's policy limit.

After discovery and prior to the first of two trials, on July 31, 2007, Tate's counsel offered to settle with Surgery Center for the full amount of its policy with APA—$1 million. APA rejected the demand. On August 3, 2007, Dr. Hasson's insurance carrier settled with Tate for his policy limit of $1 million. The same day, Surgery Center moved the court to reconsider the previous denial of its motion for summary judgment; the court granted reconsideration and dismissed the case. In December 2009, the Illinois Appellate Court partially reversed, remanding for trial the issue of whether the nursing staff at Surgery Center breached the standard of care when discharging Tate and whether the breach proximately caused Tate's injury.

Following remand, APA raised the Reserve to the maximum amount of the policy limit—$1 million. APA did not inform Surgery Center that it increased the Reserve but told Surgery Center that it continued to believe the case was de-

fensible. Prior to the second trial, in May 2010, Tate sent an-
other settlement demand for the policy limit of $1 million.
APA again rejected this demand.

The jury returned a verdict for Tate for $5.17 million. Grif-
fiths retained personal counsel following the verdict and set-
tled with Tate for $2.25 million, of which APA paid $1 million,
per the policy limitation.

## B. Procedural Background

In May 2015, Surgery Center sued APA in federal court,
alleging state law claims of negligence, breach of fiduciary
duty, and concert of action. As relevant here, Surgery Center
claimed APA had acted in bad faith by failing to settle with
Tate for the policy limit. Shortly before trial, the district court
denied APA's motion for summary judgment. It held that
APA's true assessment of the likelihood of a liability finding
against Surgery Center and of the potential damages amount
in excess of Surgery Center's policy limit were disputed issues
of material fact. The court observed that the increase in the
Reserve following remand potentially indicated APA's belief
that Surgery Center would be found liable at trial, though the
purpose of the increase and the method of calculating the Re-
serve remained in dispute.

The case proceeded to a jury trial. Surgery Center pre-
sented evidence that in 2005 APA had promoted a new Vice
President of Claims who implemented a company-wide strat-
egy, the "Concrete Plan," to promote aggressive defense of
claims against its insured. Shelly Oblak, the APA claims rep-
resentative handling the Tate case, testified that APA rated
the case a nine out of ten as to "severity" based on plaintiff
Tate's condition and that the initial Reserve on the case was

$560,000. APA calculated the Reserve by predicting and multiplying several factors: Full Liability Value (the estimated damages award against all defendants, assuming Tate won— $8 million); the chance of losing (70%); and Surgery Center's estimated percentage share of liability (10%). Oblak testified that APA rejected Tate's first settlement demand for the policy limit of $1 million because it believed the case was defensible. That same day, Oblak wrote Griffiths advising her that APA was not making an offer of settlement to Tate, that APA would not be responsible for any payment in excess of Surgery Center's policy limit, and that Surgery Center may wish to retain personal counsel to advise it regarding the potential excess exposure.

When the state court dismissed the Tate case on a renewed summary judgment motion during the first trial, Oblak documented in the case file that APA had "a lot to be thankful for." She testified she held this belief because it was a high exposure case with a sympathetic plaintiff. Following appellate remand, however, APA raised the Reserve to the full policy limit of $1 million. Oblak explained how APA made this calculation: a $7 million Full Liability Value estimate, multiplied by Surgery Center's 100% share of liability (as Dr. Hasson had settled out of the case), divided in half to reach the "midpoint" of $3.5 million. Because the policy limit was $1 million, however, APA capped the Reserve at that amount. Notably, the second Reserve calculation did not take into account APA's evaluation of the likelihood of success on the case; rather, it merely assessed potential damages.[1]

---

[1] Oblak testified as much, as did Tom Reed, an APA claims litigation manager, and Catherine Shutack, APA's Vice President of Claims.

Prior to the second state trial, Oblak wrote to Griffiths to inform her about Tate's renewed $1 million settlement demand; she wrote that APA was not negotiating a settlement and again reminded Griffiths of the policy limit. Oblak testified that she believed the case "got better for the defense" on remand; Tate did not have a nursing expert to testify against the nurses at Surgery Center, which APA considered significant because a medical malpractice case in Illinois requires the support of expert testimony. Oblak also testified that she met with Griffiths prior to the second trial and that Griffiths told Oblak she believed it was a "frivolous case and that it should be tried."

Griffiths testified that she knew from day one of working with APA and Lowis & Gellen that she could hire a personal lawyer to represent Surgery Center if she "didn't think that Jennifer [Lowis] was doing a good job." Prior to meeting Oblak, Griffiths had the clinical staff at Surgery Center review Tate's medical records and wrote to Lowis, "Although you are correct to suggest that they indicate a patient with a poor prognosis, I think that they also strongly support the argument that The Surgery Center showed no sign of negligence with respect to her care." Griffiths further explained to Lowis, "I'm concerned because you … chose to highlight the severity of the patient's injuries in your cover letter to … APA and didn't balance the fact by letting [APA] know that the evidence so far has all supported our stand that The Surgery Center was not negligent." Griffiths concluded, "I really think we have an extremely strong case in Tate" and asked Lowis to communicate that to APA.

Lowis then sent Griffiths a letter detailing the severity of Tate's injuries and warning her that an adverse jury verdict

"could easily be in the range of $10 million or more." However, Lowis explained her belief that liability for the Surgery Center for independent negligence was unlikely. Griffiths had additional conversations with Oblak and Lowis about the case, focusing on whether the Surgery Center nurses had met the standard of care, and if their care was good—which Oblak, Griffiths, and the Surgery Center clinical staff agreed it was—Surgery Center was going to win the case. Griffiths acknowledged that she expressed to Lowis and Oblak she "felt like we did the right things and … felt like it didn't feel fair" to settle because "[t]he case was frivolous." When confronted with emails with updates from Lowis throughout the pendency of the Tate case, Griffiths recognized that she knew Tate's condition was not improving from the time of Lowis's initial estimate of the potential damages and that she had been told Cook County was a "dangerous" jurisdiction for defendants.

On July 11, 2007, Griffiths emailed Lowis to implore her not to settle the case: "I know that insurance companies make their decisions based on economics, but I really would not feel right settling this case where I think that it is clear that we were not negligent in any way." In a series of emails to Oblak over the next week, Griffiths explained:

- I know that as our insurer you will be doing a cost benefit analysis of whether or not to move this case into a settlement posture based largely on the defense and settlement costs of each scenario. I understand fully the rationale. However, I would like you to consider our opinion on this matter.

- I request that you strongly consider allowing us to continue to assert our defenses and allow us to win this case.

- [I]f you will continue to allow plaintiffs to believe that there's always money on the table, then we will only fuel the frivolous naming of surgery centers in cases that involve surgeons' judgments only.

- Please do not consider settling this case under any circumstances. We cannot encourage plaintiffs' lawyers to think that they can intimidate us into putting money on the table when we more than met the standard of care.

- The constant increase in premiums have literally made one of our centers not profitable, and we're wondering how we're going to get by.

- I beg you to be as aggressive as possible and use every available means to make this painful and expensive for the plaintiff and her lawyer.

Griffiths also testified during her direct examination that she was not made aware of Tate's 2007 $1 million settlement demand nor that APA rejected the demand. On cross-examination, however, APA's counsel showed Griffiths a copy of the settlement rejection letter with Griffiths blind copied and a contemporaneous email from Griffiths to Oblak thanking her "for standing behind us and not settling." Shortly thereafter, Lowis emailed Griffiths:

> Sometimes I lose sight of the damage potential
> in this case because it seems so defensible and
> the plaintiff has done such a sloppy job putting
> it together, but I do want to remind you that this
> plaintiff is a quadriplegic. And if there is an ad-
> verse verdict, it could be and would likely be in
> excess of your insurance limits.

Griffiths acknowledged that after the appellate court par-
tially reversed the midtrial grant of summary judgment,
Lowis spoke with her about Surgery Center's likelihood of
success at an upcoming trial. Specifically, Lowis told Griffiths
that while the case would likely proceed to trial "on the the-
ory that the patient was discharged from The Surgery Center
without Dr. Hasson seeing her," the testimony was "favorable
… on the wrongful discharge theory," and therefore, Lowis
believed Surgery Center was "very likely to prevail on that
issue before a jury." Additionally, when Smith took over for
Lowis following the remand, Griffiths acknowledged that
Smith told her they were going to win because Tate did not
have the right kind of expert. Oblak too told Griffiths that the
case got better on remand because Tate was limited to a single
claim. Finally, Griffiths testified that she received a copy of
Tate's second settlement demand letter and of APA's rejection
of the demand but that the decision to reject the demand was
not discussed with her.

Several additional APA witnesses believed Tate's case,
though significant from a damages perspective, was weak
when it came to proving Surgery Center's liability. For exam-
ple, Tom Reed, an APA claims litigation manager, testified
that he thought it was critical that Tate had not disclosed a
nursing expert to testify in support of her case and believed

there was "a strong empty-chair defense against Dr. Hasson." Reed estimated Surgery Center's chance of losing in the 2010 trial was 25%. Additionally, also based on Tate's lack of a nursing expert, defense counsel Smith estimated Surgery Center's likelihood of success at trial was 90%.

Although Surgery Center relied on two experts at the summary judgment stage to opine on the significance of APA raising the Reserve following remand in 2010—Guy O. Kornblum and Allan D. Windt—at trial Kornblum did not offer testimony linking the increase of the Reserve in 2010 to APA's assessment of Surgery Center's risk of liability, and Windt did not testify at all.[2]

At the close of Surgery Center's bad-faith case, APA moved for judgment as a matter of law under Rule 50(a). The district court concluded that the disputed facts that had prevented summary judgment were no longer in dispute. It determined that the evidence presented at trial showed APA believed the Tate case was "highly defensible." The court cited the standard for the duty to settle under Illinois law from *Haddick ex rel. Griffith v. Valor Insurance*, 763 N.E.2d 299 (Ill. 2001), and explained:

> [T]here has to be a reasonable probability of recovering on the excess policy limits, and a reasonable probability of a finding of liability against the insured. They have to both be there.

---

[2] The district court granted in part APA's motions in limine regarding Surgery Center's experts, precluding the experts from interpreting governing law and from opining on what APA and defense counsel did or should have done or whether they violated the law.

> It can't be one or the other. And here the evidence and testimony all demonstrate that the possibility of recovery, again, was always on the table. [Surgery Center] was well aware of this fact, that it would be a possible recovery in excess of the limit. However, everyone agreed, everyone from lawyers to medical to the plaintiff herself, that there was a really good chance of—they would be successful as to no liability finding.

The district court relied on Griffiths's emails to Lowis insisting Surgery Center had done nothing wrong with respect to caring for Tate, imploring Lowis to be as aggressive as possible in defending the case, and expressing appreciation that APA was not settling. The court granted APA's motion and entered judgment in its favor on all claims on June 26, 2018. Surgery Center appeals.

## II. Discussion

### A. Legal Standards

We review a district court's ruling on a Rule 50(a) motion for judgment as a matter of law de novo. *Ruark v. Union Pac. R.R. Co.*, 916 F.3d 619, 625 (7th Cir. 2019). Judgment as a matter of law is appropriate if, after "a party has been fully heard on an issue during a jury trial[,] … a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The judgment as a matter of law standard "'mirrors'" the standard for granting summary judgment, "such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250–51 (1986)). In deciding a Rule 50(a) motion, the "court does not make credibility determinations or weigh the evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012).

In Illinois, an insurer has a duty to act in good faith when responding to a settlement offer.[3] *Haddick*, 763 N.E.2d at 303. While an insurer may consider its own interests when evaluating a settlement offer, it must, "in good faith, give at least equal consideration to the interests of the insured and if it fails so to it acts in bad faith." *Cernocky v. Indem. Ins. Co. of N. Am.*, 216 N.E.2d 198, 205 (Ill. App. Ct. 1966). To sustain a bad-faith claim against its insurer, a policyholder must establish: "[1] the duty to settle arose; [2] the insurer breached the duty; and [3] the breach caused injury to the insured." *Haddick*, 763 N.E.2d at 304. The duty to settle arises when a third party demands settlement within the policy limits, "a claim has been made against the insured[,] and there is a reasonable probability of recovery in excess of policy limits and a reasonable probability of a finding of liability against the insured." *Id.*

The parties dispute what is required to satisfy the "reasonable probability" standard—whether it is akin to a more-likely-than-not standard (as APA argues) or whether it falls somewhere above a mere possibility but less than a preponderance standard (as Surgery Center argues). The Illinois Supreme Court announced the reasonable probability standard in *Haddick* but has not articulated a definition. The Illinois Appellate Court, however, has weighed in, stating that it

---

[3] "Because we sit in diversity, we apply the substantive law that Illinois's courts would choose—in this instance, the law of Illinois." *Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 421 (7th Cir. 2016).

"read[s] *Haddick* as requiring the pleading of facts which show that liability is at least more likely than not, but not necessarily a certainty." *Powell v. Am. Serv. Ins. Co.*, 7 N.E.3d 11, 17 (Ill. App. Ct. 2014). "When a state supreme court has not spoken on an issue, the decisions of the state's intermediate appellate courts are authoritative unless we have a compelling reason to doubt that they have stated the law correctly." *AAR Aircraft & Engine Grp., Inc. v. Edwards*, 272 F.3d 468, 470 (7th Cir. 2001).[4]

**B. Surgery Center's Evidence**

APA argues we should affirm judgment as a matter of law in its favor because Surgery Center did not introduce any evidence that the duty to settle the Tate case ever arose. It claims that at no point was there a reasonable probability that Surgery Center would be found liable.[5] Although APA urges us to follow the Illinois Appellate Court's interpretation of reasonable probability as akin to more likely than not, it argues that it prevails even if we apply the lesser standard Surgery Center promotes. We agree; because APA prevails under either definition of the standard, we need not opine on a question of state law the Illinois Supreme Court has yet to address.

---

[4] Surgery Center spends much of its appellate brief arguing that APA failed to disclose a conflict of interest to Surgery Center. As Surgery Center acknowledged at oral argument, however, it did not bring any claim for bad faith failure to disclose a conflict of interest and instead proceeded to trial exclusively under the theory of bad faith failure to settle.

[5] The parties do not dispute that there was a reasonable probability of recovery in excess of the policy limits if a jury found Surgery Center liable (as it in fact did).

Juries can be unpredictable, so there is always a possibility of liability in a jury trial even in the strongest of cases. That mere possibility of liability is not enough to prevent an award of judgment as a matter of law for APA. Surgery Center needs *evidence* that its liability was reasonably probable for the duty to settle to have arisen—it has none. Oblak, the APA claims representative handling the Tate case, testified that she believed the case was defensible, meaning she thought Surgery Center would not be found liable. Oblak believed this from the start, and she testified that she thought Surgery Center's case got stronger after remand because Tate was limited to a single claim and did not have an appropriate expert to testify on that claim. The attorneys handling the defense, Lowis and Smith, both shared Oblak's belief in the case's defensibility. From the beginning, Lowis believed individual liability for Surgery Center was unlikely. Following remand, Lowis affirmed her belief in an email to Griffiths: "We have a lot of testimony that is favorable to us on the wrongful discharge theory, and we believe we are very likely to prevail on that issue before a jury." When Smith took over defense of the case, he confirmed he shared the belief that Surgery Center would win because Tate did not have the right expert witness to support her claim.

Griffiths, Surgery Center's president and main witness at trial, did little to help Surgery Center's case and, in fact, severely undermined it. Document after document showed that Griffiths also believed the case was defensible and Surgery Center would not be found liable because it was not negligent in providing care to Tate. Though Griffiths testified she relied on Oblak's, Lowis's, and Smith's counsel to form that view, she also testified she had the Surgery Center clinical staff review Tate's records and that they too believed Surgery Center

was not at fault. Indeed, Griffiths repeatedly asked Lowis and Oblak not to focus on the potential for significant damages and instead focus on "the evidence [that] so far has all supported our stand that The Surgery Center was not negligent." Griffiths made clear to APA and to defense counsel that she did not want the case settled: "I request that you strongly consider allowing us to continue to assert our defenses and allow us to win this case…. Please do not consider settling this case under any circumstances."[6]

The most Surgery Center can point to as evidence of reasonable probability of liability is the increase in APA's Reserve following remand from the appellate court. It argues APA's increase of the Reserve, and failure to inform Surgery Center of the increase, evidences bad faith: APA must have known Surgery Center was at an increased risk of liability, so much so that it increased the Reserve from $560,000 to the full policy limit of $1 million. And though APA protected itself by putting $1 million in Reserve in the event of an adverse jury finding, Surgery Center argues, APA did not warn Surgery Center to set aside money to pay for an adverse judgment in excess of the policy limit.

The evidence is to the contrary: APA repeatedly reminded Surgery Center of the policy limit and that Surgery Center would be responsible for any judgment exceeding that limit. Moreover, Lowis reminded Griffiths on numerous occasions that Tate had serious injuries and if Surgery Center was found

---

[6] Surgery Center emphasizes that these communications were around the time of the first state trial in 2007 and that Griffiths did not reiterate these requests at the time of the second trial in 2010. There was no evidence, however, that Griffiths expressed any alternative view—*i.e.* that she ever requested APA consider settling prior to the second trial.

liable, damages "could easily be in the range of $10 million or more." Though APA increased the Reserve amount following remand, evidence at trial showed the increased amount, as opposed to the initial Reserve of $560,000, did not take into account APA's evaluation of the likelihood of success on the case.[7] Instead, it focused on potential damages, which everyone knew could greatly exceed the policy. This evidence does not support the inference Surgery Center suggests and is insufficient to establish a reasonable probability of its liability.[8]

Surgery Center also points to evidence of APA's "Concrete Plan" to argue APA aggressively defended litigation and to suggest that such defense tactics were unreasonably invoked in APA's defense of the Tate case. There is no evidence, however, of a connection between the Concrete Plan and APA's decision not to settle the Tate case. Indeed, the evidence showed Griffiths urged APA not to settle because she

---

[7] Surgery Center argues the testimony of its expert, Robert Martier, supports that APA estimated a 50% likelihood of success on the merits following remand based on the increase in the Reserve. However, Surgery Center takes Martier's testimony out of context to make this argument: at one point Martier stated APA "variously evaluated [the] risk at 10[%], 25[%], or even 50, 50," but that statement was not connected to any testimony about the Reserve.

[8] At oral argument, Surgery Center pointed to the following as evidence demonstrating APA's knowledge of the likelihood of liability: the severity of Tate's injury and sympathy for Tate, the case was pending in Cook County (which is known for high plaintiffs' verdicts), the discharge nurse was a poor witness, Tate's boyfriend had died and was unavailable to testify, and the expert nurse APA retained to testify for Surgery Center performed poorly in her deposition. But the evidence at trial showed everyone involved knew this information, including Griffiths, and they all still believed Surgery Center was not negligent and would prevail.

believed the case was frivolous and because she was concerned about the effect of a settlement on Surgery Center's insurance premiums. Thus, evidence of the Concrete Plan is irrelevant to the issue of whether a duty to settle arose in this particular case.

Surgery Center did not present any evidence that anyone involved in litigating the Tate case believed there was more than a mere possibility Surgery Center would be found liable, and the mere possibility of liability is insufficient under either party's preferred interpretation of the Illinois Supreme Court's reasonable probability standard. Because "a reasonable jury would not have a legally sufficient evidentiary basis" to find the duty to settle arose—*i.e.* that there was a reasonable probability of a finding of liability against Surgery Center— the district court properly granted judgment as a matter of law for APA. *See* Fed. R. Civ. P. 50(a)(1).

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.