In the

# United States Court of Appeals
## For the Seventh Circuit

───────────────

No. 23-2577

HENRY BEVERLY,

*Plaintiff-Appellant,*

*v.*

ABBOTT LABORATORIES, an Illinois Corporation, and VICTORIA
LUO,

*Defendants-Appellees.*

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-05590 — **Sarah L. Ellis**, *Judge*.

───────────────

ARGUED APRIL 10, 2024 — DECIDED JULY 10, 2024

───────────────

Before RIPPLE, HAMILTON, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Henry Beverly worked as a finan-
cial analyst for Abbott Laboratories. That company was re-
structured, and his job duties changed. Beverly sought and
received a personal leave of absence from Abbott, during
which he started working for Cook County. Beverly did not
tell Abbott about his other employment while on leave. That
leave was extended twice. But when he sought a third

extension, his position at Abbott had been filled, and the company terminated his employment.

Beverly sued Abbott alleging, among other claims, racial discrimination and defamation. The district court granted summary judgment on some of his claims, and others went to trial before a jury who found for Abbott. Beverly appeals certain pretrial, trial, and posttrial rulings. We affirm the district court's decisions in full.

**I**

We begin by examining Beverly's work history, his extended leave of absence, and his termination. For the district court's rulings on summary judgment and judgment as a matter of law, we view that evidence in the light most favorable to him and draw all reasonable inferences in his favor. *Navratil v. City of Racine*, 101 F.4th 511, 516 (7th Cir. 2024) (for summary judgment); *Sun v. Xu*, 99 F.4th 1007, 1013 (7th Cir. 2024) (for judgment as a matter of law).

**A.  Beverly's Work at Abbott and Change in Job Duties**

Beverly, a Black man, worked briefly for Abbott in 2002 and was later rehired as a senior financial analyst in 2007. In 2008, he transferred laterally to a new position in which he was supervised by Kevin Bowler from 2008 to mid-2012.

In late 2012, Victoria Luo became Beverly's direct supervisor. When Luo took over, Beverly assumed some of Bowler's prior duties and handled any work for which Luo did not have the certification or training. Luo also enlarged Beverly's role to include more contact with and training of certain managers. In 2012 and 2013, Luo tasked Beverly with preparing templates and programs to allow other employees to report

on their new sales. Beverly also created new financial models and prepared a variety of reports.

Abbott split into two companies in 2013, Abbott and AbbVie. As part of this restructuring, Abbott eliminated the team which handled systems work for Luo's group. Her group hired new people and shifted duties from 2013 to 2015. The new hires in Luo's group were all Asian men.

After this restructuring, Luo shifted some of Beverly's duties, including uploading annual forecasts and new sales transactions and manipulating data and spreadsheets, to a new team member. Beverly trained that team member on how to perform those duties. He also retained responsibility for reporting-related training. Later in 2014, Luo reduced Beverly's role and his interaction with affiliates, placing him on a new project.

Beverly had regularly attended different company meetings. But by 2013 Beverly was excluded from certain meetings attended by other team members. He no longer had the opportunity to attend desired training sessions, although in 2014 Luo approved Beverly to attend an annual conference about healthcare information systems. Beverly also traveled to receive training in Mexico. Over the same period, other team members attended different trainings overseas. Abbott instituted a travel freeze in 2014 on all overseas travel for meetings and trainings.

By 2015, Beverly no longer prepared several reports, further reducing his job duties. He testified that in 2015, all that remained for him to do was to prepare part of a PowerPoint presentation for a meeting and to answer ad hoc requests

from affiliates. This amounted to about one to two hours of work per week.

Abbott never disciplined Beverly or placed him on a performance improvement plan. He received various letters of recognition and awards during his employment. In his 2012, 2013, and 2014 performance reviews, Luo gave Beverly an "achieved expectations" rating. Beverly's base rate of pay in April 2012 was $94,820.74. That rate increased to $97,902.41 in April 2013 and $100,839.48 in March 2014.

### B. Beverly's Leave of Absence and Termination

On March 16, 2015, Beverly requested a personal leave of absence from Abbott to begin on March 20, with an anticipated return date of May 25. Before his request, and unknown to Abbott, Beverly had applied for and obtained a full-time position with Cook County. Luo granted Beverly's requested leave on March 20, but she told him that due to its duration, Abbott may have to search for a backup to cover his job during his absence.

Beverly understood Abbott's leave policy when he made his request. In relevant part, the policy provides that Abbott retains the discretion to grant or deny leave based on operational needs and the employee's performance. The policy does not limit or prohibit Abbott's ability to terminate the employment of an at-will employee. In fact, Abbott does not guarantee reinstatement from a personal leave of absence. Notably, the policy also prohibits an employee from obtaining "full-time employment while on a personal leave of absence," and if the employee does so, "the leave will be canceled and termination will be automatic."

While on leave, Beverly reached out to Luo to discuss his leave and how things were at Abbott. Luo said everything was going well and that Beverly's work was covered. Soon after, Beverly emailed Luo and Abbott's third-party benefits administrator to request an extension of his personal leave of absence through June 29. Luo approved the extension the next day. A few days later, Luo, with the aid of Abbott's human resources department, posted Beverly's position on May 22, 2015. Luo never informed Beverly that she posted his job internally.

On June 24, Beverly again asked to extend his personal leave of absence through July 31. Luo approved his request. While Beverly remained out on his extended leave, Abbott offered his position to Bruce Tsai, an Asian American who had previously worked at AbbVie. Tsai accepted.

On July 26, Beverly sought a third leave extension, this time through August 22. Luo, rather than responding to Beverly, contacted Abbott's human resources and spoke with Kevin Mason about terminating Beverly's employment. Mason, the director of business human resources, supported Luo's decision to terminate Beverly's employment with Abbott. On July 29, Mason and Luo called Beverly and informed him that they were denying his request to extend his personal leave of absence. This amounted to a termination of employment, effective July 31.

Luo later called Global Security, the Abbott department responsible for investigating safety and security concerns, to discuss the deactivation of Beverly's work badge and his access to the Abbott worksite. Per the Global Security employee that spoke with Luo, Luo stated that Beverly had a "history of lying" and could be a security threat. Luo said she did not

want personal contact with Beverly and that she did not feel comfortable with him. Luo did not specify any objectionable or untoward statements that Beverly had made, she did not report that Beverly lied in any of his performance reviews, and she denied during her later deposition that Beverly lied to her. Global Security prepared a report of this conversation, which other Abbott employees could access.

## II

### A. Pretrial Proceedings

Beverly sued Abbott and Luo. In his operative second amended complaint, Beverly's claims included, as relevant on appeal, (1) racial discrimination and retaliation, related to reduction of his job duties and his termination, in violation of 42 U.S.C. § 1981 and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et seq.*; and (2) defamation against Abbott and Luo for the report that said Beverly had a "history of lying."

After years of discovery and COVID-related delays, defendants moved for summary judgment. In response, defendants raised the affirmative defense that Luo's statement was a non-actionable opinion. The district court granted in part and denied in part Abbott's motion. The court granted summary judgment on those portions of Beverly's racial discrimination and retaliation claims connected to the termination of his employment. The court denied summary judgment on those same claims as to the reduction of Beverly's job duties. Defendants' motion for summary judgement on the defamation claim was also denied.

Shortly after the summary judgment decision, the parties filed proposed jury instructions. On the defamation claim,

defendants stated that they intended to proceed "upon the understanding that their opinion defense to the defamation claim will be decided by the court as a matter of law based upon the evidence at trial."

At the final pretrial conference, Abbott and Luo again raised the defense that the statements Beverly challenged as defamatory were non-actionable opinions. The district court asked if Beverly objected to "that defense being decided by the Court rather than the jury as a matter of law?" Beverly's counsel did not, so the district court reserved ruling, stating that it planned to wait until the close of Beverly's case-in-chief to rule.

**B. Trial**

A four-day jury trial took place in January 2023. The day before trial, defendants filed a bench brief arguing their opinion defense to Beverly's defamation claim. No motion was filed, and the brief did not cite any rule of civil procedure. The district court said it would not rule until Beverly could be heard. Beverly responded on the second day of trial. Later that same day, the district court entered an order for defendants on Beverly's defamation claim. The court reasoned, "the opinion defense involves a question of law that [it] must decide before the defamation claim may go to the jury and Beverly cannot claim surprise." Illinois law provides that a statement a person is a liar—without the context of specific facts—is an opinion. Because the court had no specific facts against which to test Luo's statement, it concluded that the challenged statement was a non-actionable opinion.

Some of the district court's rulings during the jury trial are disputed. The initial two concern Beverly's questioning of

Luo. First, when Beverly's counsel questioned Luo on the topic of Tsai's hiring, she attempted to impeach her before establishing that a deposition occurred. Eventually, with the court's guidance, Beverly's counsel completed her impeachment of Luo. Second, after the district court had dismissed the defamation claim, Beverly's counsel attempted to question Luo about her conversation with Global Security, which was the basis for the now-dismissed defamation claim. Defense counsel objected based on relevance. When the court asked why Beverly's counsel was proceeding down this line of questioning, Beverly's counsel initially said, "I'm not sure what — I'm not sure what I can ask her[.]" In a later discussion with the court, Beverly's counsel said the testimony went to Luo's animus towards Beverly. The district court rejected this argument. Beverly's counsel then offered that it was relevant to Luo's credibility, which the district court rejected.

Comments by Abbott's counsel during closing argument are also contested, though this objection was not raised until later in Beverly's motion for new trial. Those remarks faulted Beverly for the absence of a "tear or a whimper" and contended that "[t]his is business for him, nothing but business." After closing arguments, the district court instructed the jury that those arguments were not evidence and should not be considered if contradicted by the evidence. The jury was specifically instructed not to consider any evidence pertaining to the defamation claim during its deliberations. The court also instructed, "if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered."

The jury found for Abbott on all of Beverly's claims. Beverly moved for a new trial, which the district court denied. This appeal followed.

### III

This case narrowed during its lengthy journey through motion practice and trial. Beverly contends on appeal that the district court: (1) erroneously granted Abbott summary judgment on his racial discrimination and retaliation claims related to his termination; (2) incorrectly entered judgment as a matter of law for Abbott on his defamation claim; and (3) committed numerous errors during the jury trial.

### A. Summary Judgment

Beverly argues the district court erred by finding that a reduction in his job duties did not amount to a constructive discharge and by granting summary judgment on the portions of his racial discrimination and retaliation claims related to his termination.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. In employment discrimination cases, the question at summary judgment is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

*1. Constructive discharge and changes in Beverly's job duties*

Beverly challenges the district court's finding that his reduction in job duties, while an adverse employment action that survived summary judgment, did not amount to a constructive discharge.

This court has said that adverse employment actions generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *E.g., Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011) (emphasis added).

To prevail on a claim of constructive discharge, Beverly must show "that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). We assess such a claim "from the viewpoint of a reasonable employee." *Ziccarelli v. Dart*, 35 F.4th 1079, 1091 (7th Cir. 2022); *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 537 (7th Cir. 1993).

This court recognizes two forms of constructive discharge: when an employee resigns due to discriminatory harassment, and "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated … ." *Equal Emp. Opportunity Comm'n v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). The first requires "a discriminatory work environment even more egregious than

the high standard for hostile work environment." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1119 (7th Cir. 2022). The second requires the plaintiff to show that "she was forced to resign because her working conditions became so intolerable that a reasonable person would have felt compelled to resign." *Id.* (cleaned up).

Conditions amounting to constructive discharge must be pervasive and extreme. *See, e.g.*, *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1043 (7th Cir. 2023) (no constructive discharge where plaintiff provided information about an isolated "severe" incident of racial discrimination); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 631–33, 641 (7th Cir. 2009) (where employees taunted the plaintiff with nooses and threatened him with comments about his death because of his race, that conduct "clearly qualifies as egregious for purposes of constructive discharge"); *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006) (constructive discharge where plaintiff's boss was obsessive and capable of and desirous of physically assaulting her).

Beverly claims that, beginning sometime in 2013, Luo materially altered his job duties and excluded him from meetings and trainings, leaving him with at most one to two hours of work per week. This could rise to the level of a constructive discharge, Beverly says, because Luo stripped him of all meaningful work but still required him to report to work with nothing to do.

For working conditions to constitute constructive discharge, an employer's actions must communicate to the employee that he "immediately and unavoidably will be terminated." *Wright v. Ill. Dept. of Child. & Fam. Servs.*, 798 F.3d 513, 529 (7th Cir. 2015). Beverly continued to work at Abbott

for about two years after his job duties began to change. He also felt secure enough in his employment with Abbott to ask for a personal leave of absence and repeated extensions. There is no indication that Abbott intended to fire Beverly. Although Beverly testified that he feared termination when he requested his personal leave of absence, nothing suggests that Abbott intended to take such action around that time so as to make his termination "an imminent and inevitable event." *Chapin*, 621 F.3d at 680 (collecting cases). Although Beverly's job duties were reduced, nothing showed that his time at Abbott was coming to an end. He did not receive poor performance reviews, and he continued to receive salary increases. While Beverly had fewer job duties due to the reorganization of Abbott and hiring of new team members, he does not allege he experienced any other changes or bad experiences with his coworkers and supervisor.

For these reasons, the district court correctly concluded that the reduction in Beverly's job duties did not amount to a constructive discharge. Notwithstanding that finding, the district court considered the reduction to be an adverse employment action and allowed those claims to continue.

### 2. Discriminatory animus and Beverly's termination

Beverly also challenged his termination, saying it was a racially discriminatory adverse employment action in violation of 42 U.S.C. § 1981 and the IHRA. To prove discriminatory animus motivated an adverse employment action under those statutes, Beverly must show that his race caused the action. *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022); *Zaderaka v. Ill. Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989). On Beverly's § 1981 claim, he was required to establish but-for causation. *See Lewis*, 36 F.4th at 759. For his

IHRA race discrimination claim, the protected category must have been a motivating factor in the termination. *See Zaderaka*, 545 N.E.2d at 687.

Beverly contends that he was fired because of his race, and that Abbott proffered pretextual reasons for doing so. Specifically, he argues that Abbott did not follow its personal leave of absence policy, and that Luo lied when she said that she needed someone to perform Beverly's job duties. Abbott disagrees and submits that Beverly can cite to no evidence of discrimination.

"In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (cleaned up). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 505 (7th Cir. 2017) (alteration in original). Speculation about colleagues' ill motives is too conclusory to create an issue of material fact. *See Johnson v. Advoc. Health & Hosp. Corp.*, 892 F.3d 887, 899 (7th Cir. 2018); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone … does not support a reasonable inference of retaliation … ."). Causation can be shown through evidence of, for example, comments or animus toward the protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretextual reasons given for the adverse employment action. *Monroe*, 871 F.3d at 504.

Abbott's proffered reason for terminating Beverly's employment was that the company needed someone to take on those job duties, so it hired a replacement. Abbott did so only after repeated extensions of Beverly's personal leave of absence.

Abbott's proffered reason for firing Beverly was consistent with the undisputed facts. He understood Abbott's personal leave of absence policy, so he knew that Luo may need help and seek to replace him during his leave. Yet, Beverly continued to request extensions, three in total. Because the personal leave of absence policy provided for only unprotected leave, Beverly cannot complain that Abbott terminated him based on its decision to hire someone in his place while he remained on a personal leave of absence. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate … .").

Beverly's assertion that Abbott lied about its reason for terminating his employment similarly fails to support his allegations of pretext. He contends that, had Luo made clear to him the need for his help at work, he would have gladly returned to Abbott from his personal leave of absence. But Beverly had already secured a job with Cook County and failed to tell Abbott about his new position. Moreover, it was within Abbott's discretion whether to inform Beverly about its search for new employees and its decision to terminate his employment after his personal leave of absence.

The district court ruled correctly that Abbott did not have a pretextual or discriminatory reason for terminating Beverly's employment. None of his arguments persuade us otherwise.

### B. Defamation Claim

Beverly takes issue with the district court's mid-trial order entering judgment as a matter of law on his Illinois state law defamation claim. We first consider the timing of this order, then its merits.

#### 1. Timing

Beverly alleges that Abbott and Luo defamed him when Luo told Global Security that Beverly had a "history of lying." Defendants raised the affirmative defense that Luo's statement was a non-actionable opinion. The defendants did not move for summary judgment on this defense. Rather, during trial preparation, they said they would stand on this defense. Their proposed jury instructions stated, "Defendants proceed here based upon the understanding that their opinion defense to the defamation claim will be decided by the court as a matter of law based upon the evidence at trial."

A district court has broad discretion in when to enter judgment as a matter of law on a claim. Under Federal Rule of Civil Procedure 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may … resolve the issue against the party… ." And, importantly for this case, a motion is not required. *See* FED. R. CIV. P. 50(a). Yet, as this court has explained in the analogous context of summary judgment, a sua sponte judgment "is a hazardous procedure which warrants special caution." *Osler Inst., Inc. v. Forde*, 333 F.3d 832, 836 (7th Cir. 2003).

We review a district court's entry of judgment as a matter of law under the federal standard, de novo, even where the

district court applies state law to the merits of the motion. *See, e.g., Hall v. Flannery*, 840 F.3d 922, 931 (7th Cir. 2016) (citing *Sokol Crystal Prods., Inc. v. DSC Commc'ns. Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994); *cf. Osler Inst.*, 333 F.3d at 837. The standard for granting judgment as a matter of law "mirrors" the standard for granting summary judgment. *Surgery Ctr. at 900 N. Mich. Ave., LLC v. Am. Physicians Assurance Corp.*, 922 F.3d 778, 784 (7th Cir. 2019) (cleaned up); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

The opinion defense to defamation is a question of law to be addressed by the court, not the jury. *See Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 398 (2008).[1] The viability of the defamation claim and the strength of the opinion defense were at issue throughout this litigation. The court permitted both sides to brief the claim and the defense before it decided the question. The district court's ruling thus should not have caught Beverly off guard.

Still, the district court's approach—granting judgment as a matter of law at trial during the plaintiff's case—should be avoided if possible. Such timing is disruptive and risks making the jury trial unfair. Beverly was prevented from offering promised evidence of the defamation, yet Abbott was able to present evidence that the alleged defamatory statement was true.

---

[1] Beverly's counsel conceded at the final pretrial conference that she "wouldn't object if there was … a basis for the Court to determine as a matter of law [the defamation claim]." Transcript of Final Pre-Trial Conf. at 20, *Beverly v. Abbott Lab'ys*, No. 1:17-cv-05590 (N.D. Ill. Dec. 21, 2022), ECF No. 214.

Even if the evidence Beverly wished to offer had been admitted, however, he still would have lost on the merits. And Beverly has not identified evidence that could have been presented that would have overcome Abbott's protected opinion defense. So any arguable error with the district court's timing was harmless.

Beverly also claims prejudice because the order on the defamation defense was entered after opening statements. The defamation claim had already been discussed before the jury, but all evidence on that claim had not yet been received. He asserts the timing adversely affected his lawyer's credibility and confused the jury.

But the jury was specifically instructed not to consider any evidence pertaining to the defamation claim during its deliberations. The court also instructed, "if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered." These instructions addressed any potential prejudice resulting from the timing of the district court's judgment. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 769 (7th Cir. 2013) (citing *United States v. Lee*, 558 F.3d 638, 649 (7th Cir. 2009) ("Absent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction.")). So, again, any error is harmless.

### 2. Merits

To prove defamation under Illinois state law, Beverly must show: (1) defendants made a false statement about him; (2) defendants made an unprivileged publication of that

statement to a third party; and (3) the publication caused damages, or the harm is obvious on its face. *See Basile v. Prometheus Glob. Media*, 225 F. Supp. 3d 737, 742 (N.D. Ill. 2016) (applying Illinois law).

Whether a statement is an opinion or assertion of fact is a question of law. *Moriarty v. Greene*, 732 N.E.2d 730, 740 (Ill. App. 2000) (citing *Owen v. Carr*, 497 N.E.2d 1145, 1148 (Ill. 1986)). To aid in this legal determination, courts ask whether: (1) the statement "has a precise and readily understood meaning;" (2) the statement is factually verifiable; and (3) the "literary or social context signals that [the statement] has factual content." *Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 840 (Ill. 2006). "The test is restrictive: a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact." *Id.* (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 208 (Ill. 1992)). "[B]ut if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (citing *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 17–21 (1990)). A non-actionable statement of opinion is one where the statements are "too broad, conclusory, and subjective to be objectively verifiable." *Liu v. Nw. Univ.*, 78 F. Supp. 3d 839, 850 (N.D. Ill. 2015).

Illinois courts have repeatedly held that general statements about a person's honesty constitute non-actionable statements of opinion. *See Quinn v. Jewel Food Stores, Inc.*, 658 N.E.2d 1225, 1229–30 (Ill. App. 1995). "[T]he general statement that someone is a liar, not being put in context of specific

facts, is merely opinion." *Piersall v. SportsVision of Chi.*, 595 N.E.2d 103, 107 (Ill. App. 1992).

Beverly argues that because Luo, as Beverly's supervisor, made these statements in the employment context, that should alter the analysis. But the statement at issue is still too broad and generalized to be actionable. *See Perfect Choice Exteriors, LLC v. Better Bus. Bureau of Cent. Ill., Inc.*, 99 N.E.3d 541, 550–51 (Ill. App. 2018) (holding defendant's grading of and comments about plaintiff's unsatisfactory performance were constitutionally protected opinions, not verifiable statements of fact that could support a claim for defamation). Luo's statement that Beverly had a "history of lying" is the type of vague and generalized opinion protected under the First Amendment. While the line between non-actionable statements of opinion and actionable false factual assertions can be difficult to parse, that is not so here.

For these reasons, the district court properly entered judgment for defendants on Beverly's defamation claim.

## C. Trial Decisions

Beverly's last contentions concern some of the district court's rulings at trial. He argues the court should have granted his motion for a new trial because it: (1) abused its discretion in deciding his defamation claim during trial; (2) failed to follow Federal Rule of Evidence 613 in its rulings concerning his counsel's impeachment attempts; and (3) should have allowed evidence at trial of Luo's post-termination statements to Global Security.[2]

---

[2] Beverly offers three additional arguments: (1) evidence regarding Abbott's personal leave of absence policy and his Cook County employment should have been excluded; (2) some pretrial evidentiary rulings

The denial of a motion for new trial is reviewed for abuse of discretion. *See Ewing v. 1645 W. Farragut LLC*, 90 F.4th 876, 886 (7th Cir. 2024). This court "shall not second-guess the decision of a trial judge that is in conformity with established legal principles and, in terms of its application of those principles to the facts of the case, is within the range of options from which one would expect a reasonable trial judge to select." *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 754 (7th Cir. 2002) (citation omitted). "[W]e reverse only if the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) (cleaned up).

Just as Beverly's first argument on his defamation claim fell short on de novo review, it fails under the more deferential review for the denial of a motion for new trial.

His second argument—that the court misapplied Rule 613 in its rulings concerning his counsel's impeachment attempts—also misses the mark. District courts have wide discretion to control the mode and order of presenting evidence at trial. *See* FED. R. EVID. 611(a); *Gong v. Hirsch*, 913 F.2d 1269,

---

were unfair; and (3) certain remarks made by Abbott's counsel in closing argument should not have been allowed.

Although Beverly made numerous objections during trial, he failed to object on these three grounds. By knowingly and intentionally deciding not to object at trial, Beverly waived these arguments. *See United States v. Flores*, 929 F.3d 443, 448 (7th Cir. 2019); *see also Christmas v. City of Chicago*, 682 F.3d 632, 640 (7th Cir. 2012) ("By failing to object, Plaintiffs may not raise the issue for the first time in a motion for a new trial or on appeal.").

Even if these arguments are only forfeited, we see no error here. *See Flores*, 929 F.3d at 448.

1274 (7th Cir. 1990). When Beverly's counsel tried to impeach Luo by referencing testimony from her deposition, defense counsel objected. The court sustained the objection, and Luo was allowed to read the statement, and then answer whether the statement was made during her deposition. The district court noted that "the time between that question and counsel's attempt at impeachment spanned over fifty pages of the transcript and a lunch recess." Beverly's counsel's initial attempt at impeachment was thus improper, and she needed to re-elicit the in-court testimony she sought for impeachment by disclosing the prior statement. *See* FED. R. EVID. 613(b) ("Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement … .").

A witness's prior statement is not hearsay where it "is inconsistent with the declarant's testimony." FED. R. EVID. 801(d). The attempt to impeach Luo began on the wrong foot. By attempting to introduce an out-of-court statement without first properly establishing the recent in-court testimony of Luo, the use of her deposition seemed to be framed as an offer of inadmissible hearsay.[3] The district court then aided Beverly's counsel in the impeachment process, and the examination of Luo was completed. So, no evidence was excluded based on defense counsel's "improper impeachment" objection.

---

[3] Neither party raised the possibility of treating Luo's deposition testimony as a party admission under Federal Rule of Evidence 801(d)(2)(A) and (D). Further, Rule 613(b) does not apply to statements by an opposing party.

Beverly's counsel next attempted to introduce Luo's prior statement without laying a proper foundation. "Under Rule 613(b), extrinsic evidence of a prior inconsistent oral or written statement is not permitted unless the witness is afforded an opportunity to explain or deny and the opposite party is afforded an opportunity to interrogate him thereon." 21 AM. JUR. PROOF OF FACTS 2d 101 § 12. Beverly's counsel did not first establish that Luo gave a deposition. The district court noted that step should be taken. Though the court assisted Beverly's counsel with impeachment attempts, this did not prejudice Beverly. With that help, Beverly's counsel presented the evidence to the jury, and neither sequence provides grounds for a new trial.

Beverly's third argument—that the court should have allowed evidence at trial of Luo's post-termination statements to Global Security—does not succeed either. "The decision whether to admit evidence is a matter peculiarly within the competence of the trial court and will not be reversed absent a clear abuse of discretion." *Manuel v. City of Chicago*, 335 F.3d 592, 595 (7th Cir. 2003) (citation omitted); *see Downing v. Abbott Lab'ys*, 48 F.4th 793, 813 (7th Cir. 2022); *Henderson v. Wilkie*, 966 F.3d 530, 534 (7th Cir. 2020). This court "give[s] particularly great deference to the trial court's decision weighing probative value against prejudice." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005).

At trial and now on appeal, Beverly argues that the relevance of these statements to Global Security lies in their alleged contradiction to Luo's expected testimony. She testified Beverly never intimidated her and that she called Global Security "because she … thinks he wasn't going to give the laptop back … And then the jury can decide, 'Do I believe what

she's saying? … .'" The district court ruled that this evidence was "too attenuated" of an attack on Luo's credibility. The court noted the reason Luo said she had concerns was that Beverly did not return Abbott's property, yet "the jury's already heard he didn't, and he didn't return it until this week. So, how that goes to her credibility, I don't see the link." That reasoning is not an abuse of discretion.

Given our deference to trial decisions such as these, we have not been presented with a convincing reason to overturn the jury's verdict and to grant a new trial.

## IV

Beverly's numerous challenges to the district court's decisions at summary judgment, trial, and after trial do not succeed for the reasons explained above. We AFFIRM the district court in all respects.